Bruce and Blonnie Sudduth, residents of Tuscaloosa County, sued Consolidated Management Systems, Inc. (a Florida corporation not registered to do business in Alabama) (hereinafter called "CMS"); Larry Howard (a Florida resident and the general manager of CMS); and Michael Howard (a Florida resident and the vice president of CMS), alleging breach of contract and fraud "arising out of CMS's marketing of a vending machine franchise 'opportunity' to the Sudduths in May 1991."[1] CMS, Larry Howard, and Michael Howard moved for summary judgments. The trial court entered a summary judgment for Larry Howard, holding that the State of Alabama lacked in personam jurisdiction over him; it denied the summary judgments for CMS and Michael Howard. The trial court certified the summary judgment for Larry Howard as final, pursuant to Rule 54(b), A.R.Civ.P. The Sudduths appeal. We reverse and remand.
The Sudduths contend that the trial court erred in entering the summary judgment for Larry Howard on the basis of lack of personal jurisdiction, because, they say:
 "[T]he evidence submitted in opposition to summary judgment — seen in [the] light most favorable to [them as] the nonmoving parties — tended to show that [Larry Howard] participated in, if not masterminded, a scheme to defraud and deceive potential investors, and that the scheme to defraud and deceive ultimately led to a fraud perpetrated on Alabama residents. . . ."
The issue is whether, within the bounds of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Larry Howard, who is a Florida resident, had sufficient contacts with the state of Alabama to make it fair and reasonable to require him to come to Alabama from Florida to defend against the present action.
Viewing the evidence in the light most favorable to the Sudduths, the nonmoving parties, as we are required to do under the applicable standard of review, we find evidence of the following:
CMS was a closely held family-operated corporation headquartered in Merritt Island, Florida. It marketed investment "opportunities" in vending machines to potential small investors throughout the United States.
When CMS was incorporated in 1988, William Hooper, Larry Howard's father-in-law, who was in his 70s and was a retired automobile body mechanic living in Pompano Beach, Florida, served as president. Michalin Howard, Larry Howard's wife, who was in her mid-40s, held a high school diploma, and had been a housewife before her involvement in CMS, served as vice-president and owned 100% of the stock in the company. Larry Howard was the general manager.
Neither William Hooper nor Michalin Howard had any experience in selling vending *Page 666 
or other business opportunities. Larry Howard was the only member of his family with any experience in selling business opportunities. He had been involved in the vending machine business since 1985 (in Alabama and Georgia) and with other business opportunities before that time.
In 1989, Michael Howard, the son of Larry and Michalin Howard and the grandson of William Hooper, graduated from college with a degree in marketing and joined CMS as a salesman. He had no prior experience in the vending opportunity business. In 1991, Michalin Howard replaced William Hooper as president of the company and Michael Howard became vice president of the company. Larry Howard continued as the general manager.
CMS sent salespeople into Alabama and maintained an ongoing relationship with at least seven owner-operators in the state; however, it never registered to do business in Alabama. CMS is no longer in business and has not advertised or sought investors since 1992.
In May 1991, the Sudduths saw CMS's advertisement in TheTuscaloosa News offering an investment opportunity in "Fun Snax" 25-cent vending machines, which involve vends of smaller portions of an item for a lower price per vend. They contacted CMS about the advertisement. Thereafter, J.R. Rogers, a salesman for CMS, visited the Sudduths and gave them promotional literature drafted by Larry Howard and Michael Howard. The promotional literature contained a "Profit Performa [for Fun Snax]"; a "Fun Snax Profit Analysis"; a cassette tape entitled "Business Opportunities of the 90's"; a letter to "Dear Prospective Client" from Larry Howard as "General Manager"; and testimonials from allegedly satisfied CMS owner-operators. The "Profit Performa" and "Profit Analysis" projected anticipated vending sales of Fun Snax items. Both documents stated: "The figures here are mathematical calculations based on information from 'Vending Times Magazine' and their survey 'Census of the Industry.' The amount of profits you make depends upon your efforts and interest in the growth of your business." The letter to "Dear Prospective Client" from Larry Howard, as general manager, stated in pertinent part as follows:
 "I would like to personally thank you for taking time out of your day to listen to this program. I'm
sure that together, if you qualify, we can build for you a life of unlimited possibilities."
(Emphasis added.)
Relying on this promotional material given them by Rogers, the Sudduths contracted with CMS and paid it $12,000 for the "Plan I Investment" of 8 owner-operator machines and 4 company machines. After becoming aware that the projections in the "Profit Performa" and the "Profit Analysis" were misleading in that they were based on a general analysis of the entire confection/snack vending industry, and not Fun Snax machines in particular, and concluding that the CMS operation was a scam, the Sudduths tried to rescind the contract with CMS. CMS refused to refund their money.
Larry Howard, the general manager of CMS at the time of the sale to the Sudduths in May 1991, had discussed and worked with Michael Howard in drafting the "Profit Performa" and "Profit Analysis," and they chose and approved the form and size of the disclaimer on the "Profit Analysis." Larry Howard reviewed the final documents and approved their use by CMS salespeople in convincing people to buy into the Fun Snax program as owner-operators. He authorized the making of the cassette tape, reviewed and approved its contents, disseminated it through salespeople to potential owner-operators, such as the Sudduths, and signed the letter that appeared on the cover of the materials accompanying the cassette tape that was mailed to the Sudduths in May 1991. Larry Howard and Michael Howard recruited and hired salespeople for CMS, including Rogers. Larry Howard drafted other promotional materials, which were contained in a presentation notebook approximately 20-25 pages long, for use by the salespeople in recruiting owner-operators. He helped train the salespeople by giving them the promotional notebook and by reviewing the notebook with them. Larry Howard and Michael Howard spoke with the *Page 667 
salespeople to determine if they were following the guidelines. All of the materials Rogers used during his meeting with the Sudduths had been approved by Larry Howard. In fact, CMS put out no material without Larry Howard's approval.
Before the sale to the Sudduths, Larry Howard knew that Rogers, the sales representative in Alabama, had requested that advertisements be placed in Alabama newspapers. Larry Howard admitted that, in placing advertisements in Alabama newspapers, he was targeting the readers of those newspapers and that the advertisements in Alabama newspapers were aimed at Alabama residents. Larry Howard also admitted knowing that Rogers would be taking into Alabama the sales promotional literature, including the cassette tape, that CMS salespeople had been trained to use in the presentation to potential owner-operators.
In Knowles v. Modglin, 553 So.2d 563, 565-66 (Ala. 1989), the Court thoroughly discussed the due process analysis involved in determining whether a court has in personam jurisdiction:
 "In Dillon Equities v. Palmer Cay, Inc., 501 So.2d 459, 461 (Ala. 1986), this Court stated:
 " 'It has long been established that physical presence in the state is not a prerequisite to effective service of process on a nonresident defendant; Milliken v. Meyer, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940); see also Shrout v. Thorsen, 470 So.2d 1222 (Ala. 1985). What is required is that the out-of-state resident have "some minimum contacts with this state [so that], under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action." Rule 4.2(a)(2)(I), Ala.R.Civ.P.
 " ' " '[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " ' McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Alabama's long-arm statute (Rule 4.2, Ala.R.Civ.P.) has been interpreted by this Court to extend the jurisdiction of Alabama courts to the permissible limits of due process. DeSotacho, Inc. v. Valnit Industries, Inc., 350 So.2d 447
(Ala. 1977), Duke v. Young, 496 So.2d 37
(Ala. 1986).
 " 'Alabama's long-arm procedure for service of process is not limited to "rigid transactional categories" or subject to a mechanical formula. Alabama Waterproofing Co. v. Hanby, 431 So.2d 141
(Ala. 1983). Instead, the relevant facts and attendant circumstances must be examined and the relationship among the defendant, the forum, and the litigation analyzed to determine if the defendant has sufficient "minimum contacts" so that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington.'
 "A relevant factor in a due process analysis is whether the defendant should have reasonably anticipated that he would be sued in the forum state. In Dillon Equities, supra, at 462, this Court, quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), noted:
 " ' "The foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." (Citations omitted.) In determining if an out-of-state defendant should have "reasonably anticipate[d]" litigation in the forum state, the United States Supreme Court has frequently drawn from the reasoning of Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958):
 " ' " 'The unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will *Page 668 
vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " '
 "Other relevant factors include the burden placed on the defendant; the interest of the forum state in adjudicating the dispute; the plaintiffs' interest in obtaining convenient and effective relief; and the interstate judicial system's interest in obtaining the most efficient resolution of the controversy. World-Wide Volkswagen Corp., supra, 444 U.S. at 292, 100 S.Ct. at 564-65; see, also, Dillon Equities, supra.
 "Rule 4.2(a), A.R.Civ.P., provides, in pertinent part, as follows:
 " '(2) Sufficient Contacts. A person has sufficient contacts with the state when that person, acting directly or by agent, is or may be legally responsible as a consequence of that person's
" '(A) transacting any business in this state;
 " '(B) contracting to supply services or goods in this state;
" '. . . .
 " '(I) otherwise having some minimum contacts with this state and, under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action. The minimum contacts referred to in this subdivision (I) shall be deemed sufficient, notwithstanding a failure to satisfy the requirement of subdivisions (A)-(H) of this subsection (2), so long as the prosecution of the action against a person in this state is not inconsistent with the constitution of this state or the Constitution of the United States.' "
After examining the particular facts and circumstances of this case, we conclude that the trial court erred in entering the summary judgment for Larry Howard on the conclusion that it lacked in personam jurisdiction. Larry Howard approved and/or prepared materials used to induce people into buying vending machines and knew that these materials would be provided to customers in Alabama. He caused advertisements to be placed in Alabama newspapers to solicit customers in Alabama. Considering the nature of these activities, the resultant foreseeability that he might be required to defend an action in Alabama, the obvious interest of the Sudduths in obtaining convenient and effective relief, and the relative lack of inconvenience that would be incurred by Larry Howard's appearing and defending against the action in an Alabama court, we are convinced that there was a clear, firm nexus between Larry Howard and the consequences complained of and that that nexus was sufficient to establish the contacts necessary for in personam
jurisdiction; see Duke v. Young, 496 So.2d 37, 39 (Ala. 1986), and that, under the circumstances of this case, it is "fair and reasonable" to require him to defend against this action in Alabama.
We note Larry Howard's contention that, under the "fiduciary shield doctrine," he lacks sufficient contact with this state for purposes of personal jurisdiction. We find that argument to be without merit. Larry Howard's status as an employee or agent of CMS is not relevant in this case. This Court held inDuke v. Young, 496 So.2d 37, 40 (Ala. 1986):
 "[A]s demonstrated by the facts and holding in Calder [v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)], an individual is not shielded from liability simply because his acts were done in furtherance of his employer's interest. In fact, the Court stated there that the defendants' 'status as employees does not somehow insulate them from jurisdiction.' Calder, supra, 465 U.S. at 790, 104 S.Ct. at 1487."
See, also, Ex parte Sekeres, 646 So.2d 640 (Ala. 1994).
Larry Howard specifically cites us to Thames v. Gunter-Dunn,Inc., 373 So.2d 640 (Ala. 1979), and Pierce v. Heyman,480 So.2d 1185 (Ala. 1985). However, the Court in Duke, supra, at 40, distinguished Thames and Pierce on their facts, holding that "[i]n each instance the tortious act complained of was exactly what Calder referred to as 'mere untargeted negligence.' " See Lowry v. Owens, *Page 669 621 So.2d 1262 (Ala. 1993). The thrust of the Sudduths' allegation is that Larry Howard participated in, if he did not mastermind, a scheme to defraud and deceive potential investors in Alabama. This is not an allegation of "mere untargeted negligence." Rather, this is an allegation of intentional and tortious action expressly aimed at Alabama residents. See,Lowry v. Owens, supra, at 1266; Calder, supra, 465 U.S. at 789,104 S.Ct. at 1487; Duke, supra, at 40.
For the foregoing reasons, we conclude that Larry Howard had such contacts with Alabama to permit this state's courts to exercise jurisdiction over him. Therefore, we reverse the summary judgment and remand this cause.
REVERSED AND REMANDED.
HORNSBY, C.J., and ALMON, KENNEDY and COOK, JJ., concur.
[1] The Sudduths also sued J.R. Rogers, the CMS salesman who visited the Sudduths in their home in May 1991. Rogers was never served with the summons and the complaint, and the Sudduths have been unable to locate him. According to CMS, Rogers terminated his association with CMS shortly after the events alleged in the complaint.