[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 797 
Petitioners-defendants Sam McInnis, Michael Borka, and Tim Shingleton petition this Court for a writ of mandamus to direct the trial judge to vacate her order denying these defendants' Rule 12(b)(2), Ala.R.Civ.P., motions to dismiss for want of personal jurisdiction and to direct her to enter an order granting these motions. We deny mandamus relief to the defendants McInnis and Shingleton but grant mandamus relief to the defendant Borka.
Anticipating the possibility that this Court might grant the writ of mandamus sought by the petitioner-defendants, the plaintiff Pamela Alice Little Daniel has filed her own petition for a writ of mandamus to direct the trial judge to vacate an order granting these defendants' motions to strike certain evidentiary materials submitted by the plaintiff in opposition to these defendants' Rule 12(b)(2) motions to dismiss. The plaintiff asks that, if we grant these defendants relief by directing the trial judge to vacate her order denying these defendants' Rule 12(b)(2) motions, we also direct the trial judge to consider the plaintiff's evidentiary materials in a further consideration of these defendants' Rule 12(b)(2) motions. The plaintiff's petition for a writ of mandamus is moot in part and denied in part.
Pamela Alice Little Daniel, as the administratrix of her husband's estate, sued Sam McInnis, Michael Borka, Tim Shingleton, Snap Products, Inc., Snap Automotive Products, Inc., and other foreign corporations for tortiously formulating, manufacturing, labeling, and distributing a product named "Fix-a-Flat Non-Explosive Formula," *Page 798 
which, the plaintiff alleges, killed her husband Joe Ed Daniel, and for thereby wrongfully causing his death. Each of the defendants McInnis, Borka, and Shingleton, all residents of North Carolina, filed a Rule 12(b)(2), Ala.R.Civ.P., motion to dismiss the claims against him for lack of personal jurisdiction on the ground that he did "not have sufficient or minimal personal contacts to confer personal jurisdiction over him, individually or as an officer of Snap, in the courts of Alabama in this action"; and each of these defendants filed an affidavit in support of his motion to dismiss. Thereafter, the plaintiff filed an amended complaint, and the defendant Shingleton filed a supplemental affidavit. The parties agreed that these three defendants could refrain from answering the plaintiff's complaint as amended until after these defendants' Rule 12(b)(2) motions to dismiss were finally decided.
In hearing and denying these three defendants' Rule 12(b)(2) motions, the trial judge considered only those facts alleged in the plaintiff's complaint and amended complaint and those facts sworn in the four affidavits filed by the defendants. The trial judge refused to consider the evidentiary materials submitted by the plaintiff.
In considering a Rule 12(b)(2), Ala.R.Civ.P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiff's complaint not controverted by the defendant's affidavits, Robinson v. Giarmarco Bill, P.C., 74 F.3d 253
(11th Cir. 1996), and Cable/Home Communication Corp. v. NetworkProductions, Inc., 902 F.2d 829 (11th Cir. 1990), and "where the plaintiff's complaint and the defendant's affidavits conflict, the . . . court must construe all reasonable inferences in favor of the plaintiff."Robinson, 74 F.3d at 255 (quoting Madara v. Hall, 916 F.2d 1510, 1514
(11th Cir. 1990). "For purposes of this appeal [on the issue of inpersonam jurisdiction] the facts as alleged by the . . . plaintiff will be considered in a light most favorable to him [or her]." Duke v. Young,496 So.2d 37, 38 (Ala. 1986).
A denial of a Rule 12(b)(2) motion to dismiss for want of personal jurisdiction is interlocutory and preliminary only. After such a denial, the continuation of personal jurisdiction over a defendant who appropriately persists in challenging it in the defendant's answer to the complaint and by motion for summary judgment or at trial depends on the introduction of substantial evidence to prove the plaintiff's jurisdictional allegations in the plaintiff's complaint. Hunt v. BPExploration Co. (Libya) Ltd., 492 F. Supp. 885, 895 (N.D.Tex. 1980);Speir v. Robert C. Herd Co., 189 F. Supp. 436 (D.Md. 1960); Champ Lyons, Jr., Alabama Rules of Civil Procedure Annotated § 12.3 (3d ed. 1996); and Wright and Miller, Federal Practice and Procedure: Civil
§ 1351 at 568 (1969). See also Ex parte Sekeres, 646 So.2d 640, 642
(Ala. 1994) (Houston, J., concurring specially).
A writ of mandamus is an extraordinary remedy which requires a showing of (a) a clear legal right in the petitioner to the order sought, (b) an imperative duty on the respondent to perform, accompanied by a refusal to do so, (c) the lack of another adequate remedy, and (d) the properly invoked jurisdiction of the court. Ex parte Bruner, 749 So.2d 437, 439
(Ala. 1999). "Because the order of the trial court was interlocutory, a writ of mandamus is an appropriate remedy for the petitioners in this case." Ex parte Paul Maclean Land Servs., Inc., 613 So.2d 1284, 1286
(Ala. 1993).
"A corporate agent who personally participates, albeit in his or her *Page 799 
capacity as such agent, in a tort is personally liable for the tort."Sieber v. Campbell, 810 So.2d 641, 645 (Ala. 2001). See also Bethel v.Thorn, 757 So.2d 1154, 1158 (Ala. 1999), and Ex parte Charles BellPontiac-Buick-Cadillac-GMC, 496 So.2d 774, 775 (Ala. 1986). Likewise, corporate agent status does not insulate the agent personally from his or her jurisdictional contacts with a state or from personal jurisdiction in the state. Calder v. Jones, 465 U.S. 783, 790 (1984); Sieber, supra;Sudduth v. Howard, 646 So.2d 664, 668 (Ala. 1994); and Duke, 496 So.2d at 40.
The plaintiff's amended complaint pleads the manner of Mr. Daniel's death and pleads the personal participation of the defendants McInnis, Borka, and Shingleton in the formulation, manufacture, labeling, and distribution of the product which killed Mr. Daniel. These three defendants' own affidavits supply the remaining facts necessary to an analysis of the issue of the personal jurisdiction of the Alabama court over them.
On June 4, 1997, Mr. Daniel was killed by the explosion of Snap Fix-a-Flat Non-Explosive Formula ("the product") inside a motor grader tire mounted on its rim. He had been welding a small lug to the rim when the heat of the welding ignited the product, and the consequent explosion propelled fragments of the tire and components of the rim assembly into him and thereby decapitated him. The tire had previously been inflated with two cans of the product.
At the time the two cans of the product were manufactured, labeled, and distributed, a transferable label system was commonly available, known and used in the tire-inflator industry. Typically, a removable warning label would be affixed to the tire-inflator can with instructions to peel the label off the can and to transfer the label to whatever tire was inflated with the contents of the can. The product which killed Mr. Daniel was not manufactured or distributed with any such label, and consequently the tire which exploded had not been labeled with such a warning, even though the propellant contained in the product was explosive dimethyl ether ("DME"), known at the time to have caused injuries and deaths like Mr. Daniel's. (The name of the propellant dimethyl ether bears remembering because its explosive nature is important to the rationale of this case.) Rather, the cans used to inflate the tire involved in Mr. Daniel's death were marked "Fix-a-Flat NON-EXPLOSIVE FORMULA." (Capitalization in original.) The pleadings allege that "Mr. Daniel, and the individuals who previously purchased and injected the `fix a flat NON-EXPLOSIVE FORMULA' tire inflator product into the subject motor grader tire, were disarmed by the product's labeling into believing the motor grader tire did not have to be removed from the rim before the tacking procedure was performed."
The pleadings allege that, "[p]rior to June 4, 1997," McInnis, Borka, and Shingleton (among other defendants) "formulated, manufactured, labeled, packaged, sold, supplied and/or distributed the `fix a flat NON-EXPLOSIVE FORMULA' tire inflator/sealant involved in the accident made the basis of this suit." The ostensible corporate source of the product was Snap Products, Inc. The product was marketed "throughout the United States, including the state of Alabama." In April 1995, over two years before Mr. Daniel's death, the defendants McInnis, Borka, and Shingleton formed Snap Automotive Products, Inc., and purchased Snap Products, Inc., from its then owners, the "Bishop Estate" in Hawaii. "Defendant Snap Automotive Products, Inc. is a Delaware *Page 800 
corporation with its principal residence located in North Carolina."
 "57. At the time defendants McInnis, Borka, and Shingleton formed Snap Automotive Products, Inc., and bought Snap Products, Inc. from the `Bishop Estate,' these defendants knew the DME [(dimethyl ether)] `fix a flat' product was explosive and they had no intention to recall, or relabel, the product regarding flammability/explosivity risks."
(Amended complaint, emphasis added.) Between the time McInnis, Borka, and Shingleton formed Snap Automotive Products, Inc., to buy Snap Products, Inc., and the time the product killed Mr. Daniel, these three defendants learned of three intervening explosions of the product that injured three other men the same way Mr. Daniel would be killed. Notwithstanding this knowledge, McInnis, Borka, and Shingleton still chose not to recall or to relabel the product.
The pleadings detail extensive facts of the defendant McInnis's
personal knowledge, attitude, and acts in the formulation, manufacture, labeling, and distribution of the product. For some five years before he, Borka, and Shingleton formed Snap Automotive Products, Inc., and bought Snap Products, Inc., McInnis had participated in the evolution of tire inflators in affiliation with Snap Products, Inc., and another defendant, Nationwide Industries, Inc. For Nationwide, McInnis had marketed a tire inflator containing hydrochlorofluorocarbon ("HCFC"), a truly nonexplosive propellant that replaced a previously used propane/butane propellant, which had proved explosive. While McInnis was marketing the tire inflator containing nonexplosive HCFC, he criticized a competitor for endangering the public by using explosive DME as a propellant. Yet when the federal government prohibited the use of HCFC because it depleted the ozone layer of the atmosphere of the earth,McInnis promoted and marketed a change to the DME propellant he alreadyknew to be explosive. In deciding to change to the explosive DME, McInnis rejected still another alternative, a nonexplosive propellant called 134A, as too expensive. At the time McInnis promoted the change from the nonexplosive but ozone-depleting HCFC to the explosive DME, the competitor had recalled its DME tire inflator because of its explosionhazard. Yet McInnis rejected the use of transferable warning labels onthe explosive DME product he was marketing, and marketed the DME productas nonexplosive, because he knew it would sell better that way.
During the evolution of the product, McInnis ordered and receivedtests which proved that DME posed an explosion hazard. He also learned of tests to the same effect obtained by others. In March 1994 McInnisacknowledged, in the words of the pleadings, "that the DME `fix a flat'product was, in fact, explosive and may have to be recalled, which would cost millions of dollars, could cost Mr. McInnis his job, or could put Snap out of business." (Emphasis added.) In March and April 1994, responding to criticisms that the Snap Fix-a-Flat NON-EXPLOSIVE FORMULA posed an explosion hazard, McInnis defended his marketing of the product by explaining that Snap carried $25,000,000 in liability insurance, which would cover any losses.
The scenarios for the welding explosion injuries from tire inflators containing explosive propellants were essentially the same. A mechanic or other consumer, unaware of the explosion hazard, would perform some welding on a rim without removing from the rim a tire inflated with the inflator including the explosive propellant; *Page 801 
the heat from the welding would ignite the propellant; and the consequent explosion, or tire and rim parts driven by it, would injure the user. Such explosion injuries occurred both before and after McInnis, Borka, Shingleton formed Snap Automotive Products, Inc., to buy Snap Products, Inc. Yet McInnis, with knowledge of these explosion injuries, steadfastlyrejected the transferable warning labels and marketed the explosive DMEproduct as nonexplosive and safe in his affiliations with Nationwide, SnapProducts, Inc., and Snap Automotive Products, Inc.
While the affidavits filed by McInnis and Shingleton deny certain kinds of contacts with the state of Alabama, the affidavits of Shingleton and McInnis do reveal and admit certain other contacts. Paragraph 5 ofShingleton's first affidavit reads:
 "5. On four occasions between 1992 to [sic] early 1995, I traveled to Alabama on the business of Snap. Sometime between 1992 and 1994, I traveled twice on behalf of Snap to Tuscaloosa, Alabama, to visit a potential customer, Carport. Besides my travel time, I spent approximately one hour per visit. Carport eventually purchased some of Snap's product line, but not the Fix-a-Flat product. In the [sic] late 1994 or early 1995, I traveled to Birmingham, Alabama, to visit a potential customer, Big B Drugs. My meeting with Big B Drugs lasted approximately one hour. Finally, some time prior to 1995, I traveled to the Mobile, Alabama, area and visited with a manufacturer's representative to several local warehouse distributors. My visits with these distributors would have amounted to a total of less than four hours of time."
Paragraphs 2 and 3 of Shingleton's second affidavit read:
 "2. In my prior affidavit in this case, I referenced four isolated visits to Alabama. My short trip to Birmingham was to Big B Drugs. This visit focused on Snap Products' entire seventy plus products line, not specifically Fix-A-Flat, and did not directly result in an order for Fix-A-Flat. My one-day trip to the Mobile area was to several small distributors/retailers again relating to Snap Products' entire product line, not specifically to the Fix-A-Flat product.
 "3. None of my four trips to Alabama dealt with the manufacture, labeling, testing, or formulation of Fix-A-Flat and none of the brief trips resulted directly in the sale of Fix-A-Flat. In fact, I did not have any involvement in the formulation, testing or the labeling of Fix-A-Flat during the 1993 and 1994 period when the third generation formula was developed." (Emphasis added.)
Paragraph 5 of McInnis's affidavit reads:
 "5. In 1994 or 1995, I traveled on behalf of Snap to Tuscaloosa, Alabama, to visit an existing customer, Carport. At that time, Carport already purchased one or two Snap products but not the Fix-A-Flat product at issue in this lawsuit. The intent of my visit was to convince Carport to enter into a blanket purchase arrangement whereby Carport would carry Snap's entire entry-level line of products. The entry-level line did not include Fix-A-Flat product at issue in this lawsuit. My visit was unsuccessful, as Carport declined to enter into any such arrangement, and Carport purchased no new Snap products as a result of my visit." (Emphasis added.)
Paragraphs 3, 4, and 5 of Borka's affidavit read:
 "3. I am a North Carolina resident, and have lived in North Carolina with my family since 1993. I have never lived in Alabama or been a resident of Alabama. *Page 802 
 "4. I have never been to the state of Alabama on either personal or business matters. I do not now have nor have I ever had any contact with or interest in the state of Alabama, whether personal or business-related.
 "5. I have never owned property or real estate in Alabama. I have never been a litigant in the courts of Alabama or availed myself of the courts of Alabama. I have never received any benefits of any kind from the State of Alabama."
The affidavits of these three defendants also reveal their respective offices with Snap Products, Inc. From September 1993 to March 1995,McInnis was "Vice-President of Sales"; and, from April 1995 to November 1997, he was "Chief Executive Officer." From April 1995 to November 1997, Borka was "Chief Financial Officer." From September 1993 to March 1995, Shingleton was "a Regional Sales Manager or Vice-President of Sales"; and, from April 1995 to November 1997, Shingleton was "President of Operations." The plaintiff's pleadings allege that the product whichkilled Mr. Daniel produced approximately half of the income of SnapProducts, Inc., more income than any of its other products produced.
Rule 4.2, Ala.R.Civ.P., extends the personal jurisdiction of Alabama courts to the limit of due process under the federal and state constitutions. Sieber, supra. See also World-Wide Volkswagen Corp. v.Woodson, 444 U.S. 286, 297 (1980); Duke, supra; Brooks v. Inlow,453 So.2d 349 (Ala. 1984); and Alabama Waterproofing Co v. Hanby,431 So.2d 141, 144-146 (Ala. 1983). "A physical presence in Alabama is not a prerequisite to personal jurisdiction over a nonresident." Sieber,810 So.2d at 644. See also Sudduth, 646 So.2d at 667.
 "`"What is required is that the out-of-state resident have `some minimum contacts with this state [so that], under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action.' Rule 4.2(a)(2)(I), Ala.R.Civ.P. [(Emphasis added.)]
 "`"`"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'"'" McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Alabama's long-arm statute (Rule 4.2, Ala.R.Civ.P.) has been interpreted by this Court to extend the jurisdiction of Alabama courts to the permissible limits of due process. DeSotacho, Inc. v. Valnit Industries, Inc., 350 So.2d 447 (Ala. 1977), Duke v. Young, 496 So.2d 37 (Ala. 1986).
 "`"Alabama's long-arm procedure for service of process is not limited to `rigid transactional categories' or subject to a mechanical formula. Alabama Waterproofing Co. v. Hanby, 431 So.2d 141
(Ala. 1983). Instead, the relevant facts and attendant circumstances must be examined and the relationship among the defendant, the forum, and the litigation analyzed to determine if the defendant has sufficient `minimum contacts' so that `the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."' *Page 803 
 International Shoe Co. v. Washington." [(Emphasis added.)]
 "`A relevant factor in a due process analysis is whether the defendant should have reasonably anticipated that he would be sued in the forum state. [(Emphasis added.)] In Dillon Equities [v. Palmer 
Cay, Inc., 501 So.2d 459 462 (Ala. 1986),] this Court, quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490
(1980), noted:
 "`"`The foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there.' (Citations omitted.) [(Emphasis added.)]"'"
Sudduth, 646 So.2d at 667 (quoting Knowles v. Modglin, 553 So.2d 563,565-66 (Ala. 1989)). Rule 4.2(a) provides, in pertinent part:
 "(2) Sufficient Contacts. A person has sufficient contacts with the state when that person, acting directly or by agent, is or may be legally responsible as a consequence of that person's
". . . .
 "(D) causing tortious injury or damage in this state by an act or omission outside of this state if the person regularly does or solicits business, or engages in any other persistent course of conduct or derives substantial revenues from goods used or consumed or services rendered in this state;
". . . .
 "(I.) otherwise having some minimum contacts with this state and, under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action. The minimum contacts referred to in this subdivision (I) shall be deemed sufficient, notwithstanding a failure to satisfy the requirements of subdivisions (A)-(H) of this subsection (2), so long as the prosecution of the action against a person in this state is not inconsistent with the constitution of this state or the Constitution of the United States."
(Emphasis added.) In World-Wide Volkswagen Corp., 444 U.S. at 297-98, the Supreme Court stated that "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." In Asahi Metal Industry Co., Ltd. v. Superior Court ofCalifornia, Solano County, 480 U.S. 102 (1987), the Supreme Courtclarified the "stream of commerce" doctrine of personal jurisdiction:
 "Since World-Wide Volkswagen, lower courts have been confronted with cases in which the defendant acted by placing a product in the stream of commerce, and the stream of commerce eventually swept defendant's product into the forum State, but the defendant did nothing else to purposefully avail itself of the market in the forum State. Some Courts have understood the Due Process Clause, as interpreted in World-Wide Volkswagen, to allow an exercise of personal jurisdiction to be based on no more than the defendant's act of placing the product in the stream of commerce. Other courts have understood the Due Process Clause and the above-quoted language in World-Wide Volkswagen to require the action of the defendant to be more purposefully directed at the forum State than the mere act of placing a product in the stream of commerce. *Page 804 
". . . .
 "We now find this latter position to be consonant with the requirements of due process. The `substantial connection,' [Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985); McGee v. International Life Ins. Co., 355 U.S. 220, 223 (1957)], between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. Burger King, supra, 471 U.S., at 476. . . . The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State."
480 U.S. at 110-12 (some emphasis original; some emphasis added). "Whether sufficient contacts exist so that the maintenance of a suit in Alabama does not offend reasonableness and fair play is to be determined on a case by case basis." Bryant v. Ceat S.p.A., 406 So.2d 376, 377
(Ala. 1981), cert. denied, 456 U.S. 944 (1982).
Do the contacts of the defendants McInnis, Borka, and Shingleton pass the test of Asahi, supra, for sufficiency to support the exercise of personal jurisdiction over them by the Alabama courts? To what extent did they engage in actions "purposefully directed toward the forum State" so as to "indicate an intent or purpose to serve the market in the forum State"? Asahi, 480 U.S. at 112.
Do the contacts of these defendants pass the tests of Sudduth, supra, for sufficiency to support the exercise of personal jurisdiction by the Alabama courts? To what extent is it "fair and reasonable to require [these defendants] to come to this state to defend an action"? Sudduth, 646 So.2d at 667, and Rule 4.2(a)(2)(I). To what extent should these defendants "reasonably [have] anticipate[d] being haled into court" in Alabama? Sudduth, 646 So.2d at 667.
The plaintiff's pleadings expressly allege that each of these defendants, among other defendants, "formulated, manufactured, labeled, packaged, sold, supplied and/or distributed the `fix a flat NON-EXPLOSIVE FORMULA' tire inflator/sealant involved in the accident made the basis of this suit." The plaintiff's pleadings also allege that each of these defendants knew of the explosiveness of the product, knew of the three actual injuries caused by explosions of the product in 1995 and 1996 before Mr. Daniel's death in 1997, and participated together in the decision not to recall or to relabel the product. The pleadings, however, also reveal a greater degree of culpable participation by McInnis than by Borka or Shingleton. Likewise, uncontroverted portions of these three defendants' respective affidavits establish differences among the three in their respective degrees of physical presence in Alabama. Therefore, even though a "physical presence in Alabama is not a prerequisite to personal jurisdiction over a *Page 805 
nonresident," Sieber, 810 So.2d at 644, we will analyze the amenability of each of these defendants to personal jurisdiction in Alabama seriatim, in the order of decreasing degrees of physical presence in Alabama. See also Sudduth, 646 So.2d at 667.
Shingleton visited Alabama four times "between 1992 . . . [and] early 1995" to develop a market here for not only the product which killed Mr. Daniel, but also "Snap Products' entire seventy plus products line." He successfully enlisted Carport as a retailer of "some of Snap's product line, but not the Fix-a-Flat product." Likewise he successfully enlisted Big B Drugs as a retailer for the entire product line, including Fix-a-Flat. He also visited "a manufacturer's representative to several local warehouse distributors" and "several small distributors/retailers again relating to Snap Products' entire product line." While Shingleton's affidavit states that "[n]one of my four trips to Alabama dealt with the manufacture, labeling, testing, or formulation of Fix-A-Flat" and that he "did not have any involvement in the formulation, testing or the labeling of Fix-A-Flat during the 1993 and 1994 period when the third generation formula was developed," Shingleton does not dispute the plaintiff's allegations that Shingleton knew of the explosiveness of the Fix-A-Flat product, that he knew of the actual explosions which injured three men other than Mr. Daniel in 1995 and 1996, and that he participated in the decision thereafter not to recall or to relabel the product. Likewise, Shingleton does not dispute the plaintiff's allegation that Shingleton manufactured the product. He simply denies that his trips to Alabama "dealt with" the manufacture and denies that he had "any involvement in the labeling of Fix-A-Flat during the 1993 and 1994 period."
These facts, thus established for the purpose of judging Shingleton's Rule 12(b)(2) motion to dismiss for want of personal jurisdiction, pass the tests of Asahi and Sudduth, supra. Shingleton's actions were "purposefully directed toward the forum State" so as to "indicate an intent or purpose to serve the market in the forum State." Asahi,480 U.S. at 112. "[I]t is fair and reasonable to require [Shingleton] to come to this state to defend [this] action." Sudduth, 646 So.2d at 667, and Rule 4.2(a)(2)(I). And Shingleton "should [have] reasonably anticipate[d] being haled into court" in Alabama. Id. Therefore, the trial judge correctly denied Shingleton's motion to dismiss; and Shingleton has not established a right to mandamus relief.
McInnis admits in his affidavit that he traveled to Alabama to convince "an existing customer, Carport" (emphasis added), "to carry Snap's entire entry-level line of products," which "did not include Fix-A-Flat." McInnis's claim that this trip was unsuccessful does not eliminate the importance of the trip as a contact between him and Alabama. The trip was still "an act of the defendant purposefully directed toward the forum State" with "an intent or purpose to serve the market in the forum State." Asahi, 480 U.S. at 112. Had the trip succeeded, it would have promoted not only the particular products accepted by Carport but also the brand name itself, and the enhancement of the brand name would have promoted the sales of the explosive Snap Fix-A-Flat product being sold by other retailers.
McInnis's affidavit does not deny any of the substantive allegations of the plaintiff's pleadings. McInnis does not deny that he formulated, manufactured, labeled, and distributed the fatal product. He does not deny that he knew and suppressed its *Page 806 
explosiveness. He does not deny that he used an explosive propellant instead of a nonexplosive propellant simply to save money. He does not deny that he learned of the three injuries caused by explosions of the product in 1995 and 1996 similar to the explosion which would kill Mr. Daniel in 1997. Finally, McInnis does not deny that, with full knowledge of the explosiveness of the product and the injuries from it, he decided not to recall or to relabel the product.
The reprehensible extent of McInnis's culpability, as established by the pleadings for the limited purpose of deciding his Rule 12(b)(2) motion to dismiss, increases the importance of McInnis's contacts with Alabama enough that "it is fair and reasonable to require [him] to come to this state to defend an action," Sudduth, 646 So.2d at 667, and Rule 4.2(a)(2)(I), and enough that "he should reasonably [have] anticipat[ed] being haled into court" here, Sudduth, 646 So.2d at 667. Therefore, the trial court correctly denied McInnis's motion to dismiss, and McInnis has not established a right to mandamus relief.
Whether the plaintiff can prove her allegations against the defendants McInnis and Shingleton and can thereby maintain personal jurisdiction at the stages of the litigation that require proof as distinguished from pleadings remains to be seen. But Justice Houston's special concurrence in the procedurally analogous case of Ex parte Sekeres, 646 So.2d at 642, is appropriate here:
 "A writ of mandamus will not be issued unless there is a clear showing of error on the part of the trial court. Ex parte Rosebusch, Inc., 558 So.2d 356 (Ala. 1990). Having studied the complaint; the motion to dismiss, with the attached affidavit of Charles E. Sekeres; and the deposition of Sekeres offered in the case of Allen v. Physicians Weight Loss Centers
(CV-89-001969, Mobile Circuit Court), I cannot hold at this stage of the proceeding that the petitioner has made a clear showing of error on the part of the trial court (Ex parte Rosebusch, Inc.) or that the petitioner has a clear and undisputable right to the relief sought. It may well be that in personam
jurisdiction of Sekeres exceeds the limits of due process, but I cannot say, based upon the record now before this Court, that the trial court clearly erred in denying the motion to dismiss or that Sekeres has a clear and undisputable right to be dismissed from this action."
Without contradiction, the affidavit of the defendant Borka denies any physical presence in Alabama whatsoever. The plaintiff's pleadings do not allege that either Shingleton or McInnis was acting as Borka's agent or partner when either traveled into Alabama. The plaintiff also does not expressly allege that Borka shared or participated in the intentions and purposes of Shingleton or McInnis to develop a market specifically in the state of Alabama. Likewise, while the last cause of action in the plaintiff's amended complaint expressly alleges that McInnis, Borka, and Shingleton, as well as other defendants, conspired together in most aspects of their alleged tortious conduct, these pleadings do not allege that they conspired together in marketing the product within Alabama.
 "`Bald speculation' or a `conclusionary statement' that individuals are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory. Naartex Consulting Corp. v. Watt, 722 F.2d 779, 787 (D.C. Cir. 1983), cert. denied, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). Instead, the plaintiff must plead with particularity `the conspiracy as well as the overt acts within the forum taken in *Page 807 
 furtherance of the conspiracy.' Dooley v. United Technologies Corp., 786 F. Supp. 65, 78 (D.D.C. 1992) (citing Naartex, 722 F.2d at 787 and First Chicago Int'l v. United Exchange Co., Ltd., 836 F.2d 1375, 1378-79 (D.C. Cir. 1988))."
Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1031
(D.C. Cir. 1997). Absent express and sufficient allegations of either agency of McInnis or Shingleton or both for Borka, or a conspiracy between or among Borka and McInnis, Shingleton, or both, specifically to develop Alabama as a market, we cannot impute to Borka, for the purpose of supporting personal jurisdiction over him, either the intentions and purposes of McInnis or Shingleton to develop Alabama as a market or their physical presences in Alabama. The pleadings and affidavits in this case do not establish contacts between Borka and the state of Alabama sufficient to pass the tests of Asahi and Sudduth, supra. Accordingly, the trial judge erred in denying Borka's motion to dismiss for want of personal jurisdiction. Therefore, Borka is entitled to a writ of mandamus directing the trial judge to vacate her order denying Borka's motion to dismiss and to enter an order granting Borka's motion to dismiss.
In our case number 1990659, Ex parte Pamela Alice Little Daniel, the plaintiff herself has petitioned us for a writ of mandamus directing the trial judge to vacate the order she entered striking certain exhibits the plaintiff proffered at the hearing on the defendants' motions to dismiss for want of personal jurisdiction. The exhibits consist of materials introduced in a similar civil action by a different plaintiff against Snap Products, Inc., and Sam McInnis, but not against either Tim Shingleton or Michael Borka, in a federal district court in Minnesota.
The plaintiff has agreed anticipatorily that our sustaining the denial of the defendants McInnis's and Shingleton's motions to dismiss for want of personal jurisdiction moots the plaintiff's petition for a writ of mandamus insofar as it seeks relief from the trial judge's order granting those two defendants' motions to strike the plaintiff's exhibits. Thus we will address the plaintiff's petition for a writ of mandamus only insofar as it addresses the trial judge's order granting the defendant Borka's motion to strike the plaintiff's exhibits.
We are granting mandamus relief to the defendant Borka on the ground that he had insufficient contacts with the state of Alabama to support personal jurisdiction. From our examination of the plaintiff's proffered exhibits, we conclude that none of them constitute admissible evidence of sufficient contacts between Borka and the state of Alabama to support the exercise of personal jurisdiction over him. Therefore, we cannot and do not hold that the trial judge abused her discretion in excluding these exhibits for this purpose. No mandamus relief is due the plaintiff on her petition.
1990045 — WRIT DENIED AS TO DEFENDANTS McINNIS AND SHINGLETON; WRIT GRANTED AS TO DEFENDANT BORKA.
Moore, C.J., and Houston, Harwood, and Woodall, JJ., concur.
See, Lyons, and Brown, JJ., concur in the result in part and dissent in part.
Stuart, J., recuses herself.*
1990659 — PETITION DISMISSED AS MOOT IN PART AND DENIED IN PART. *Page 808 
Moore, C.J., and Houston, Harwood, and Woodall, JJ., concur.
See, Lyons, and Brown, concur in part and concur in the result in part.
Stuart, J., recuses herself.*
* Justice Stuart was the trial judge in this case.