MURDOCK, Justice.
 

 Kohlberg Kravis Roberts & Co., L.P. (“KKR”), KKR Associates, L.P. (“KKR Associates”), KKR Partners II, L.P. (“KKR Partners II”), and Crimson Associates, L.P. (“Crimson Associates”), and individual defendants Paul Raether, James Greene, Jr., George Roberts, Henry Kra-vis, Nils Brous, and Robert Tobin petition this Court in case no. 1091191 for a writ of mandamus directing the Jefferson Circuit Court to vacate its order denying the defendants’ motion seeking the dismissal of the plaintiffs’ complaint on the ground of lack of personal jurisdiction. Additionally, in case no. 1091206, individual defendant Ronald G. Bruno petitions this Court for a writ of mandamus directing the Jefferson Circuit Court to vacate a separate order by which it denied a motion seeking the dismissal of the plaintiffs’ claims under the Alabama Securities Act, § 8-6-1 et seq., Ala.Code 1975 (“the ASA”). We deny both petitions.
 

 I. Facts and Procedural History
 

 KKR is a Delaware limited partnership having its principal place of business in New York, New York. KKR’s affiliates— KKR Associates, KKR Partners II, and Crimson Associates — are Delaware limited
 
 *963
 
 partnerships with their principal places of business also in New York.
 
 [1]
 
 KKR Associates is the sole general partner of KKR Partners II and Crimson Associates. KKR and KKR Associates have the same 11 general partners, who include Greene, Raether, Roberts, and Kravis. Before the events that culminated in this action, KKR held significant ownership interests in a large number and wide variety of businesses throughout the nation, including supermarket-grocery chains doing business in multiple states.
 
 [2]
 

 The plaintiffs in this action are 46 individuals, partnerships, corporations, foundations, trusts, and retirement and pension funds located throughout the country that invested in certain promissory notes issued as part of a leveraged recapitalization of Bruno’s, Inc. (“Bruno’s”). At the time of the events at issue, Bruno’s was an Alabama corporation engaged in the supermarket-grocery business with its headquarters and significant operations and assets located throughout Alabama.
 

 The plaintiffs allege that in December 1994, Ronald G. Bruno, who at the time was the chairman and chief executive officer (“CEO”) of Bruno’s, invited representatives of KKR to Birmingham to conduct meetings concerning a possible takeover of Bruno’s. Raether and Greene represented KKR in those meetings. In April 1995, KKR agreed in principle that its affiliate, Crimson Associates, would acquire more than 80% of the outstanding common stock of Bruno’s.
 

 In the spring of 1995, KKR hired De-loitte & Touche LLP (“Deloitte”), an accounting firm, to conduct a due-diligence investigation of Bruno’s financial, accounting, and operational affairs, including its financial condition and financial reporting. The investigation included the physical inspection of Bruno’s assets in Alabama, including warehouses and grocery stores, and the examination in Alabama of Bruno’s books and records.
 

 On May 8, 1995, Deloitte prepared a written report for KKR and other defendants entitled “Project Crimson Due Diligence” (“Project Crimson Report”), which documented Deloitte’s findings that Bruno’s had serious problems in its facilities, financial condition, and financial reporting.
 
 [3]
 
 The Project Crimson Report detailed, among other things, that Bruno’s had overstated the worth of various assets and had understated its depreciation and self-insurance reserves and stated that a downward adjustment to Bruno’s net worth of $55.6 million was necessary.
 

 Despite the negative findings in the Project Crimson Report, KKR decided to proceed with its acquisition of Bruno’s. The plaintiffs allege that KKR determined that the best way to effect the acquisition was through a leveraged recapitalization to be executed through the efforts of KKR Associates, KKR Partners II, and Crimson Associates. In conjunction with the leveraged recapitalization, the acquisition of
 
 *964
 
 more than 80% of Bruno’s common stock was accomplished on August 18,1995.
 

 The plaintiffs allege that KKR used the knowledge it gained from the Project Crimson Report to negotiate a price reduction of over $50 million for Bruno’s common stock in effecting its takeover of Bruno’s. The plaintiffs allege that information contained in the report also caused KKR to realize that acquiring Bruno’s presented significant financial risks and that the acquisition would require a substantial amount of debt financing, including the sale of notes to the public.
 

 In order to accomplish the leveraged recapitalization, KKR had Bruno’s and its underwriters, including BT Securities Corporation (“BT Securities”), effect a public offering of $400 million in principal amount of notes described as “10-1/2% Senior Subordinated Notes due 2005” (“the notes”). In preparation for the sale, BT Securities conducted its own due diligence of Bruno’s in Birmingham. It is undisputed that the sale of the notes occurred in order to make possible the acquisition of Bruno’s.
 

 The plaintiffs allege that the defendants made material, fraudulent misrepresentations to the plaintiffs’ investment money manager, W.R. Huff Asset Management Co., LLC (“Huff’), which misrepresentations induced Huff to purchase in November 1995, on the plaintiffs’ behalf, over $190 million in principal amount of the notes. The misrepresentations were made in the form of a prospectus concerning Bruno’s (“the prospectus”) made available to Huff in August 1995, in public filings made in September 1995, in presentations made to Huff at a so-called “road show” in New York City attended by representatives of KKR, Bruno’s, and underwriters for Bruno’s, and in individual meetings at Huffs offices in Morristown, New Jersey, attended by Greene and Brous of KKR, Ronald Bruno of Bruno’s, and representatives of the underwriters. The plaintiffs allege that the defendants knew that their representations in the prospectus and in its public filings in September 1995 directly contradicted the financial information contained in the Project Crimson Report. Specifically, the plaintiffs allege that Bruno’s made a total of $243.6 million in write-downs in 1996 and 1997, and that, at a minimum, $185.6 million of these write-downs should have been taken and disclosed at the time Huff was presented the prospectus in August 1995 and when the public filings were made in September of the same year.
 

 The original complaint in this action was filed by Huff in the Jefferson Circuit Court on August 6, 1999. The case was removed to the United States Bankruptcy Court for the Northern District of Alabama (“the bankruptcy court”) because Bruno’s had filed a petition in bankruptcy and the action was related to Bruno’s bankruptcy proceedings. On April 24, 2000, Huff filed a first amended complaint in the bankruptcy court. Huff submitted a second amended complaint on May 25, 2000, that streamlined the allegations. On January 4, 2001, the bankruptcy court returned this case to the Jefferson Circuit Court. On November 14, 2001, the defendants removed the case to the United States District Court for the Northern District of Alabama (“the district court”). On November 5, 2002, while the action was pending in the district court, Huff filed a third amended complaint designed to avoid the preclusion of its claims pursuant to the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §§ 77p and 78bb. In April 2005, before the district court had ruled upon the third amended complaint, Huff sought leave to file a fourth amended complaint.
 

 On February 7, 2005, the district court struck the third amended complaint and
 
 *965
 
 denied Huffs request for leave to file the fourth amended complaint. On December 11, 2006, the United States Court of Appeals for the Eleventh Circuit vacated the district court’s denial of Huffs motion for leave to file the fourth amended complaint, and it remanded the action. On June 22, 2007, the district court granted leave for the filing of the fourth amended complaint. The defendants appealed the ruling to the Eleventh Circuit Court of Appeals, which dismissed the appeal for lack of jurisdiction. Following that ruling, the case was remanded to the Jefferson Circuit Court. On August 29, 2009, the circuit court consolidated Huffs action with an action the remaining plaintiffs had filed in 2004 against three firms that served as the underwriters for the sale of the notes that facilitated the acquisition of Bruno’s — BT Securities, Chemical Securities, Inc., and Salomon Brothers, Inc. — as well as against accounting firms Deloitte and Arthur Andersen, L.P.
 

 In the fourth amended complaint, the plaintiffs asserted claims relating to the sale of the notes, alleging fraudulent suppression; fraudulent, reckless, and negligent misrepresentation; fraudulent and reckless deceit; violations of the Alabama Securities Act (“the ASA”); breach of fiduciary duty; civil conspiracy; and aiding and abetting on all other claims. The plaintiffs allege that KKR has managed and controlled Bruno’s since the leveraged-recapitalization takeover in August 1995 and that its affiliates were organized in part or exclusively for holding the controlling interest in Bruno’s and for directing and controlling Bruno’s on behalf of the general partners of KKR.
 
 [4]
 
 All the named individual defendants became members of the Bruno’s board of directors at the time of KKR’s leveraged-recapitalization takeover. Ronald Bruno was chairman of the Bruno’s board of directors and its CEO in September 1994, and he remained a member of its board of directors through its declaration of bankruptcy in February 1998.
 

 As previously noted, the defendants filed motions in the circuit court seeking the dismissal of the plaintiffs’ claims for lack of personal jurisdiction and seeking the dismissal of the plaintiffs’ complaint, including allegations of violations of the ASA, for failure to state a claim. As also noted, the circuit court entered an order denying the defendant’s motions in all respects, concluding, among other things, that it had specific personal jurisdiction over all the defendants and that the ASA applied to the transactions at issue in this action. As noted, the petitions before us ask us to vacate the circuit court’s order as it relates to both of these conclusions.
 

 II. Standard of Review
 

 “‘The writ of mandamus is a drastic and extraordinary writ, to be “issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.”
 
 Ex parte United Serv. Stations, Inc.,
 
 628 So.2d 501, 503 (Ala.1993); see also
 
 Ex parte Ziglar,
 
 669 So.2d 133, 134 (Ala.1995).’
 
 Ex parte Carter,
 
 [807 So.2d 534,] 536 [ (Ala.2001) ].”
 

 Ex parte McWilliams,
 
 812 So.2d 318, 321 (Ala.2001).
 

 
 *966
 
 “Subject to certain narrow exceptions ..., we have held that, because an ‘adequate remedy exists by way of an appeal, the denial of a motion to dismiss or a motion for a summary judgment is not reviewable by petition for writ of mandamus.”
 
 Ex parte Liberty Nat’l Life Ins. Co.,
 
 825 So.2d 758, 761-62 (Ala.2002). One such exception is a motion to dismiss for lack of personal jurisdiction. See, e.g.,
 
 Ex parte Citizens Prop. Ins. Corp.,
 
 15 So.3d 511, 515 (Ala.2009) (stating that “[a] petition for a writ of mandamus can be used to challenge the denial of a motion to dismiss for lack of personal jurisdiction”).
 

 “A de novo standard of review applies when an appellate court reviews a trial court’s judgment on a motion to dismiss for lack of in personam jurisdiction.
 
 Hiller Invs. Inc. v. Insultech Group, Inc.,
 
 957 So.2d 1111 (Ala.2006);
 
 Elliott v. Van Kleef,
 
 830 So.2d 726 (Ala.2002). The plaintiff has the burden of proving that the trial court has personal jurisdiction over the defendant.
 
 Ex parte Covington Pike Dodge, Inc.,
 
 904 So.2d 226 (Ala.2004).
 

 “ ‘ “In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiffs complaint not controverted by the defendant’s affidavits.
 
 Robinson v. Giarmarco & Bill, P.C.,
 
 74 F.3d 253 (11th Cir.1996), and
 
 Cable/Home Communication Corp. v. Network Productions, Inc.,
 
 902 F.2d 829 (11th Cir.1990), and ‘where the plaintiffs complaint and the defendant’s affidavits conflict, the ... court must construe all reasonable inferences in favor of the plaintiff.’
 
 Robinson,
 
 74 F.3d at 255 (quoting
 
 Madara v. Hall,
 
 916 F.2d 1510, 1514 (11th Cir.1990)). ‘For purposes of this appeal [on the issue of
 
 in personam
 
 jurisdiction] the facts as alleged by the ... plaintiff will be considered in a light most favorable to him [or her].’
 
 Duke v. Young,
 
 496 So.2d 37, 38 (Ala.1986).”
 

 “
 
 ‘Ex parte McInnis,
 
 820 So.2d 795, 798 (Ala.2001).’
 

 “Ex parte Puccio,
 
 923 So.2d 1069, 1072 (Ala.2005). When a defendant files a motion to dismiss for lack of personal jurisdiction and supports that motion with an affidavit, the plaintiff is then required to controvert that affidavit with his or her own affidavit or other competent evidence to survive the motion to dismiss.
 
 Ex parte Duck Boo Int’l Co.,
 
 985 So.2d 900 (Ala.2007).”
 

 J.C. Duke & Assocs. Gen. Contractors, Inc. v. West,
 
 991 So.2d 194, 196-97 (Ala.2008).
 

 III. Analysis
 

 A. Case no. 1091191: The Circuit Court’s Denial of the Defendants’ Motion to Dismiss for Lack of Personal Jurisdiction
 

 1. The Trial Court’s Order and the Positions of the Parties.
 

 In concluding that it had specific personal jurisdiction over the defendants, the circuit court first noted that “the gravamen of the allegations contained in Plaintiffs’ Fourth Amended Complaint” was that
 

 “[t]he alleged deficiencies in the financial condition of Bruno’s Inc. identified in the Project Crimson Report are alleged to have been known by the nonresident individual Defendants either through their participation in the preparation of the said due diligence report known as Project Crimson; their allegedly] becoming aware of the contents of the report; or their alleged awareness that the Prospectus, issued in conjunction with the underwriting and mar
 
 *967
 
 keting of the Bruno’s Notes to Plaintiffs, allegedly materially misstated] the true financial condition of Bruno’s Inc. to Plaintiffs’ financial detriment.”
 

 The circuit court reasoned that based on these allegations, the “[p]laintiffs’ complaint provides a basis for specific in per-sonam jurisdiction” because the plaintiffs pleaded “that the actions of Defendants were purposeful and were directed toward an Alabama corporation. All acts and omissions alleged against Defendants are allegedly acts and omissions undertaken in the process of taking over the management and control of an Alabama Corporation, Bruno’s Inc.”
 

 The defendants counter that the alleged misrepresentations stemming from the prospectus, the public filings, the “road show,” and the one-on-one meetings with Huff did not take place in Alabama. They argue that the Project Crimson Report and the acquisition of Bruno’s are irrelevant to personal jurisdiction because, the defendants argue, they do not give rise to the plaintiffs’ claims. Instead, they argue, the plaintiffs’ claims arise from alleged misrepresentations made outside Alabama: the prospectus was distributed in relation to the nationwide sale of the notes and not specifically targeted to Alabama residents, the “road show” occurred in New York, and the one-on-one meetings with Huff occurred in New Jersey. The defendants emphasize that none of them reside in Alabama or have contacts with Alabama that relate to the allegations in the action and that none of the plaintiffs reside in Alabama. Thus, they contend that Alabama has no interest in adjudicating this action.
 

 In support of their statement that none of the defendants reside in Alabama or have contacts with Alabama that relate to the plaintiffs’ allegations of misrepresentation, individual defendants Raether, Greene, Kravis, Brous, Roberts, and Tobin submitted nearly identical affidavits in the circuit court in support of the defendants’ motion to dismiss for lack of personal jurisdiction. All but one of these defendants admitted being a member of Bruno’s board of directors from 1995 to 1999,
 
 [5]
 
 but they denied “approv[ing] and/or executing] any Bruno’s public filings while in Alabama.” All of them denied “targetfing] any activities relating to Bruno’s securities filings or the sale of Bruno’s notes toward Alabama.” All of them also denied that Bruno’s or any of the KKR affiliates was a sham corporation, i.e., that either Bruno’s or the KKR affiliates were alter egos of KKR. All of them stated that they committed no wrongdoing in relation to the Bruno’s transaction. Kravis stated that he was not a member of the KKR team assigned to the Bruno’s transaction and that he never traveled to Alabama in connection with the acquisition of Bruno’s. Kra-vis admitted attending one Bruno’s board meeting in Alabama after the acquisition occurred. Roberts stated that he was not a member of the KKR team assigned to the Bruno’s transaction. He also stated that he never traveled to Alabama in connection with the acquisition or ownership of Bruno’s, nor did he travel to Alabama in connection with his service on Bruno’s board of directors. Tobin stated that he did not travel to Alabama in connection with the acquisition of Bruno’s and that the only contacts he had with Alabama related to the action consisted of acts taken in his fiduciary capacity as a director of Bruno’s and/or as an executive at The Stop & Shop Supermarket Company, which was then a KKR affiliate. Raether, Greene, and Brous admitted that they were part of the KKR team assigned to the Bruno’s
 
 *968
 
 transaction. Each of them also stated that the only contact he had had with Alabama that related to the action consisted of acts taken in his fiduciary capacity as a KKR executive and/or as a member of the Bruno’s board of directors.
 

 The aforesaid affidavits do not mention that Kravis, Roberts, Greene, and Raether were members of KKR’s board of directors as well as on the board of directors of KKR Associates. KKR Associates was the sole general partner of Crimson Associates and KKR Partners II, the entities formed for the purpose of facilitating the acquisition of a controlling majority share of common stock in Bruno’s. The affidavits also contain no statements challenging the plaintiffs’ allegation that each of these individuals either contributed to the production of the prospectus or approved of its distribution in their capacities as members of KKR’s board of directors. Likewise, these individual defendants do not deny the plaintiffs’ allegation that they were aware of the contents of the Project Crimson Report at the time the prospectus was produced and distributed to the public for the purpose of soliciting sales of the notes.
 
 [6]
 

 The plaintiffs’ arguments echo the circuit court’s reasoning in that the plaintiffs focus on the fact that their allegations relate to the acquisition of an Alabama corporation. The plaintiffs contend that the defendants’ actions have sufficient contacts with Alabama because Bruno’s is an Alabama corporation that, at the time of the acquisition, was the largest supermarket operator in Alabama and owned and operated a large number of facilities throughout the State. The plaintiffs emphasize that all the allegations involve actions taken by the defendants to purchase Bruno’s or in furtherance of advertising and selling the notes, which financed the purchase. Those alleged actions include: meeting with Ronald Bruno in Alabama to work out preliminary details of KKR’s acquisition of Bruno’s; sending agents to Alabama to investigate the financial condition of Bruno’s; obtaining the Project Crimson Report that detailed the financial condition of Bruno’s; causing Bruno’s to offer for sale $400 million in notes to help with the leveraged recapitalization; preparing and distributing a prospectus that deliberately failed to reveal the truth about the financial condition of Bruno’s in order to facilitate the sale of the notes; actively soliciting Huff to purchase notes of the Alabama corporation through a “road show” and one-on-one meetings; and participating in Bruno’s board meetings and in the approval of Bruno’s public filings following the acquisition that deliberately delayed revealing the Alabama corporation’s actual financial condition until after the plaintiffs had purchased the notes.
 

 2. Application of Fundamental Principles of In Personam Jurisdiction.
 

 Application of established principles governing the assertion of jurisdiction by Alabama courts over out-of-state defendants begins with an acknowledgment of Alabama’s “long-arm rule”:
 

 “The extent of an Alabama court’s personal jurisdiction over a person or corporation is governed by Rule 4.2, Ala. R. Civ. P., Alabama’s ‘long-arm rule,’ bounded by the limits of due process under the federal and state constitutions.
 
 Sieber v. Campbell,
 
 810 So.2d 641 (Ala.2001). Rule 4.2(b), as amended in 2004, states:
 

 ‘“(b) Basis for Out-of-State Service. An appropriate basis exists for
 
 *969
 
 service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States.... ’
 

 “In accordance with the plain language of Rule 4.2, both before and after the 2004 amendment, Alabama’s long-arm rule consistently has been interpreted by this Court to extend the jurisdiction of Alabama courts to the permissible limits of due process.
 
 Duke v. Young,
 
 496 So.2d 37 (Ala.1986);
 
 DeSotacho, Inc. v. Valnit Indus., Inc.,
 
 350 So.2d 447 (Ala.1977). As this Court reiterated in
 
 Ex parte McInnis,
 
 820 So.2d 795, 802 (Ala.2001) (quoting
 
 Sudduth v. Howard,
 
 646 So.2d 664, 667 (Ala.1994)), and even more recently in
 
 Hiller Investments Inc. v. Insultech Group, Inc.,
 
 957 So.2d 1111, 1115 (Ala.2006):
 
 ‘Rule 4.2, Ala. R. Civ. P., extends the personal jurisdiction of the Alabama courts to the limit of due process under the federal and state constitutions.’
 
 (Emphasis added.)”
 

 Ex parte DBI, Inc.,
 
 23 So.3d 635, 643 (Ala.2009).
 

 In the oft-cited cases of
 
 International Shoe Co. v. Washington,
 
 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945),
 
 World-Wide Volkswagen Corp. v. Woodson,
 
 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and
 
 Burger King Corp. v. Rudzewicz,
 
 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the United States Supreme Court laid out fundamental principles upon which a decision as to in personam jurisdiction over a nonresident defendant must rest.
 

 “It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less.
 
 St. Louis S.W.R. Co. v. Alexander,
 
 supra, 227 U.S. [218,] 228 [33 S.Ct. 245, 57 L.Ed. 486 (1912) ], Ann. Cas.1915B, 77;
 
 International Harvester Co. v. Kentucky,
 
 supra, 234 U.S. [579,] 587 [ (1914) ].
 
 Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.”
 

 International Shoe,
 
 326 U.S. at 319 (emphasis added).
 

 “As has long been settled, and as we reaffirm today, a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist ‘minimum contacts’ between the defendant and the forum State.
 
 International Shoe Co. v. Washington,
 
 [326 U.S. 310] at 316[ (1945) ]. The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.
 

 “The protection against inconvenient litigation is typically described in terms of ‘reasonableness’ or fairness.’ We have said that the defendant’s contacts with the forum State must be such that maintenance of the suit ‘does not offend
 
 
 *970
 

 “traditional notions of fair play and substantial justice.” ’ International Shoe Co. v. Washington,
 
 supra, at 316, quoting
 
 Milliken v. Meyer,
 
 311 U.S. 457, 463 (1940). The relationship between the defendant and the forum must be such that it is ‘reasonable ... to require the corporation to defend the particular suit which is brought there.’ 326 U.S., at 317. Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State’s interest in adjudicating the dispute, see
 
 McGee v. International Life Ins. Co.,
 
 355 U.S. 220, 223 (1957); the plaintiffs interest in obtaining convenient and effective relief, see
 
 Kulko v. California Superior Court,
 
 supra, 436 U.S.[ 84], at 92 [ (1978) ], ...; the interstate judicial system’s interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies, see
 
 Kulko v. California Superior Court,
 
 supra, 436 U.S., at 93, 98.”
 

 World-Wide Volkswagen Corp.,
 
 444 U.S. at 291-92 (emphasis added).
 

 “The Due Process Clause protects an individual’s liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful ‘contacts, ties, or relations.’
 
 International Shoe Co. v. Washington,
 
 326 U.S.[ 310], at 319[ (1945) ]. By requiring that individuals have ‘fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,’
 
 Shaffer v. Heitner,
 
 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment), the Due Process Clause ‘gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit,’
 
 World-Wide Volkswagen Corp. v. Woodson,
 
 444 U.S. 286, 297 (1980).
 

 [[Image here]]
 

 “... Jurisdiction is proper, ... where the contacts proximately result from actions by the defendant
 
 himself
 
 that create a
 
 ‘substantial connection’ with the forum, State.”
 

 Burger King Corp.,
 
 471 U.S. at 471-75 (final emphasis added; footnotes omitted).
 

 In
 
 Elliott v. Van Kleef
 
 830 So.2d 726 (Ala.2002), this Court further discussed the fundamental principles outlined in the foregoing cases:
 

 “The Due Process Clause of the Fourteenth Amendment permits a forum state to subject a nonresident defendant to its courts only when that defendant has sufficient ‘minimum contacts’ with the forum state.
 
 International Shoe Co. v. Washington,
 
 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
 
 The critical question with regard, to the nonresident defendant’s contacts is whether the contacts are such that the nonresident defendant
 
 ‘
 
 “should reasonably anticipate being haled into comi” ’ in the forum state. Burger King Corp. v. Rudzewicz,
 
 471 U.S. 462, 473, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), quoting
 
 World-Wide Volkswagen Corp. v. Wood-son,
 
 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The sufficiency of a party’s contacts are assessed as follows:
 

 “ ‘Two types of contacts can form a basis for personal jurisdiction: general contacts and specific contacts. General contacts, which give rise to general personal jurisdiction, consist
 
 *971
 
 of the defendant’s contacts with the forum state that are unrelated to the cause of action and that are both “continuous and systematic.”
 
 Helicopteros Nacionales de Colombia, S.A. v. Hall,
 
 466 U.S. 408, 414 n. 9, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); [citations omitted].
 
 Specific contacts, which give rise to specific jurisdiction, consist of the defendant’s contacts with the forum, state that are related to the cause of action. Burger King Corp. v. Rudzewicz,
 
 471 U.S. 462, 472-75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).
 
 Although the related, contacts need not be continuous and systematic, they must rise to such a level as to cause the defendant to anticipate being haled into court in the forum state. Id.’
 

 “Ex parte Phase III Constr., Inc.,
 
 723 So.2d 1263, 1266 (Ala.1998) (Lyons, J., concurring in the result). Furthermore, this Court has held that,
 
 for specific
 
 in personam
 
 jurisdiction, there must exist ‘a clear, firm nexus between the acts of the defendant and the consequences complained, of’ Duke v. Young,
 
 496 So.2d 37, 39 (Ala.1986). See also
 
 Ex parte Kamilewicz,
 
 700 So.2d 340, 345 n. 2 (Ala.1997).
 

 “In the case of either general
 
 in per-sonam,
 
 jurisdiction or specific
 
 in person-am
 
 jurisdiction, ‘[t]he “substantial connection” between the defendant and the forum state necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State.’
 
 Asahi Metal Indus. Co. v. Superior Court of California,
 
 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). This purposeful-availment requirement assures that a defendant will not be haled into a jurisdiction as a result of ‘“the unilateral activity of another person or a third person.” ’
 
 Burger King,
 
 471 U.S. at 475, 105 S.Ct. 2174, 85 L.Ed.2d 528, quoting
 
 Helicopteros Nacionales de Colombia, S.A. v. Hall,
 
 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).”
 

 Elliott v. Van Kleef,
 
 830 So.2d 726, 730-31 (Ala.2002) (emphasis added; emphasis omitted).
 

 “Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with ‘fair play and substantial justice.’
 
 International Shoe Co. v. Washington,
 
 326 U.S.[ 310], at 320[ (1945) ]. Thus, courts in ‘appropriate case[s]’ may evaluate ‘the burden on the defendant,’ ‘the forum State’s interest in adjudicating the dispute,’ ‘the plaintiffs interest in obtaining convenient and effective relief,’ ‘the interstate judicial system’s interest in obtaining the most efficient resolution of controversies,’ and the ‘shared interest of the several States in furthering fundamental substantive social policies.’
 
 World-Wide Volkswagen Corp. v. Woodson,
 
 supra, 444 U.S.[ 286], at 292[ (1980) ]. These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. See, e.g.,
 
 Keeton v. Hustler Magazine, Inc.,
 
 supra, 465 U.S.[ 770], at 780[ (1984) ];
 
 Calder v. Jones,
 
 supra, 465 U.S.[ 783], at 788—789[ (1984) ];
 
 McGee v. International Life Insurance Co.,
 
 supra, 355 U.S.[ 220], at 223-224[ (1957) ].”
 

 Burger King Corp.,
 
 471 U.S. at 476-77.
 

 With respect to the question whether the defendants in this case have “purposefully established minimum contacts within the forum state,”
 
 Burger King Corp.,
 
 471 U.S. at 476, the defendants
 
 *972
 
 repeatedly emphasize that none of the plaintiffs, and only one of the defendants— Ronald Bruno — reside in Alabama. The defendants’ effort to limit our focus only to the places of residence of the plaintiffs who have allegedly been injured by the acts of the defendants, and the places of residence of the defendants themselves, is misplaced.
 
 [7]
 

 “Rule 4.2, Ala. R. Civ. P., extends the personal jurisdiction of Alabama courts to the limit of due process under the federal and state constitutions.
 
 Sieber [v. Campbell,
 
 810 So.2d 641 (Ala.2001) ].
 
 See also World-Wide Volkswagen Corp. v. Woodson,
 
 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980);
 
 Duke [v. Young,
 
 496 So.2d 37 (Ala.1986) ];
 
 Brooks v. Inlow,
 
 453 So.2d 349 (Ala.1984); and
 
 Alabama Waterproofing Co. v. Hanby,
 
 431 So.2d 141, 144-146 (Ala.1983).
 
 ‘A physical presence in Alabama is not a prerequisite to personal jurisdiction over a nonresident.’ Sieber,
 
 810 So.2d at 644.
 
 See also Sudduth [v.
 
 Howard], 646 So.2d [664,] 667 [(Ala.1994) ].
 

 “ ‘ “ ‘What is required is that the out-of-state resident have “some minimum contacts with this state [so that], under the circumstances,
 
 it is fair and reasonable to require the person to come to this state to defend an action.”
 
 Rule 4.2(a)(2)(I), Ala. R. Civ. P. [ (Emphasis added.) ]
 

 “ ““ “ ‘[D]ue process requires only that in order to subject a defendant to a judgment
 
 in personam,
 
 if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend “traditional notions of fair play and substantial justice.” ’ ”
 
 ’ McGee v. International Life Ins. Co., 355 U.S.
 
 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), quoting
 
 International Shoe Co. v. Washington,
 
 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Alabama’s longarm statute (Rule 4.2, Ala. R. Civ. P.) has been interpreted by this Court to extend the jurisdiction of Alabama courts to the permissible limits of due process.
 
 DeSotacho, Inc. v. Valnit Industries, Inc.,
 
 350 So.2d 447 (Ala.1977);
 
 Duke v. Young,
 
 496 So.2d 37 (Ala.1986).
 

 “ ‘ “
 
 ‘Alabama’s long-arm procedure for service of process is not limited to “rigid transactional categories” or subject to a mechanical formula. Alabama Waterproofing Co. v. Hanby,
 
 431 So.2d 141 (Ala.1983). Instead,
 
 the relevant facts and attendant circumstances must be examined and the relationship among the defendant, the forum, and the litigation analyzed
 
 to determine if the defendant has sufficient “minimum contacts” so that “the maintenance of the suit does not offend ‘traditional notions of fair play and substantial justice.’ ”
 
 International Shoe Co. v. Washington.’ ”
 
 [ (Emphasis added.) ]
 

 “ ‘ “A relevant factor in a due process analysis is
 
 whether the defendant should have reasonably anticipated that he would be sued in the forum state.
 
 [ (Emphasis added.) ] In
 
 Dillon Equities [v. Palmer & Cay, Inc.,
 
 501 So.2d 459, 462 (Ala.1986)], this Court, quoting
 
 World-Wide Volkswagen Corp. v. Woodson,
 
 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), noted:
 

 “ ““ “The foreseeability that is critical to due process analysis ... is
 
 *973
 
 that the defendant’s conduct and connection with the forum state are such that
 
 he should reasonably anticipate being haled into court there.”
 
 (Citations omitted.) [ (Emphasis added.) ]’ ” ’
 

 “Sudduth,
 
 646 So.2d at 667 (quoting
 
 Knowles v. Modglin,
 
 553 So.2d 563, 565-66 (Ala.1989)).”
 

 Ex parte McInnis,
 
 820 So.2d at 795, 802-03 (2001).
 

 The gravamen of the plaintiffs’ allegations is that the defendants misrepresented the financial condition of Bruno’s in connection with the acquisition of that company and the financing of that acquisition. Although many of the activities at issue did not take place in Alabama and the purchasers of the notes do not reside here, the entire focus of the defendants’ actions was the leveraged recapitalization of Bruno’s and the associated acquisition of Bruno’s. Bruno’s was an Alabama corporation, and a corporation with substantial physical assets and business operations throughout Alabama. In addition, physical contacts the defendants had with this forum — including attending meetings in Alabama to discuss the possible acquisition of Bruno’s, having KKR’s agents investigate Bruno’s in Alabama, causing Bruno’s to issue the notes to help finance the leveraged recapitalization, and participating in meetings of Bruno’s board of directors— specifically relate to the plaintiffs’ cause of action.
 

 Given these circumstances and “the relationship among the defendants, the forum, and the litigation analyzed,”
 
 Ex parte McInnis,
 
 820 So.2d at 802, we must conclude that it is appropriate for the courts of this State to exercise in personam jurisdiction over the defendants. Among other things, we cannot avoid the conclusion that the defendants’ actions were purposefully directed toward the State of Alabama in a manner that created a “substantial connection” between the defendants and this State. Further, there exists a firm nexus between the defendants’ actions and Alabama. Accordingly, the defendants have “purposefully established] minimum contacts with the forum state” such that the defendants reasonably could have anticipated being haled into court here.
 

 We also are clear to the conclusion that the assertion of jurisdiction over the defendants based on their connection with the State of Alabama comports with “traditional notions of fair play and substantial justice.”
 
 International Shoe,
 
 326 U.S. at 316. As noted above, factors that may be considered in this regard include the forum state’s interest in adjudicating the dispute and the burden on the defendants of litigating this matter in the forum state.
 
 Burger King,
 
 471 U.S. at 476-77 (quoting
 
 World-Wide Volkswagen,
 
 444 U.S. at 292).
 

 The defendants contend that they “will be unduly burdened by being forced to litigate in Alabama” because
 

 “[t]he cost and complexity of defending against Plaintiffs’ claims will be severely increased if this case is tried in Alabama given that: (i) all but one of the parties (Mr. Ronald Bruno) are non-Alabama residents; (ii) an overwhelming amount of the documents and witnesses are located outside Alabama; (iii) Defendants’ ability to call trial witnesses will be severely restricted given that Alabama may not have personal jurisdiction over critical defense witnesses, such as De-loitte and the underwriters of the Bruno’s Notes; and (iv) Defendants will have to travel hundreds of miles for court hearings and trial, and will be required to be away from home and work for an extended period of time given the expected length of any trial.”
 

 
 *974
 
 The factors the defendants raise, however, would be little different in any other forum, given the fact that the defendants and other witnesses reside in multiple states throughout the country.
 
 [8]
 
 The defendants have had a substantial presence in Alabama given their acquisition of an Alabama corporation and the individual defendants’ involvement as directors of that corporation. Moreover, as the plaintiffs observe, Alabama has an obvious and substantial interest in an action involving the acquisition of an Alabama corporation such as Bruno’s and misconduct of the nature alleged here in relation to that acquisition. Thus, traditional notions of fair play and substantial justice weigh in favor of the circuit court’s exercise of personal jurisdiction over the defendants in this case.
 

 3. The “Fiduciary Shield, Doctrine. ”
 

 Individual defendants Raether, Kravis, Greene, Brous, Roberts, and Tobin also argue that even if we determine that personal jurisdiction over KKR and its affiliates is appropriate, the court cannot exercise personal jurisdiction over them because such jurisdiction is based solely upon their actions as directors of those corporations. In so arguing, the individual defendants claim to be protected by the so-called “fiduciary-shield doctrine.” That doctrine provides that
 

 “an officer’s or employee’s mere association with a corporation is an insufficient basis for the Court to assert jurisdiction over them, even though the Court can assert jurisdiction over the corporation. See 4 C. Wright & A. Miller,
 
 Federal Practice and Procedure
 
 § 1069 at 370 (2nd ed.1987). Restated, jurisdiction over individual officers and employees of a corporation may not be predicated on the court’s jurisdiction over the corporation itself.
 
 Id.
 
 at 371.”
 

 Brink v. First Credit Res.,
 
 57 F.Supp.2d 848, 858-59 (D.Ariz.1999).
 

 As the defendants observe, this Court first applied the fiduciary-shield doctrine in
 
 Thames v. Gunter-Dunn, Inc.,
 
 373 So.2d 640, 641-42 (Ala.1979), wherein this Court stated:
 

 “[I]t is clear that jurisdiction over individual officers or employees of a corporation may not be predicated merely upon jurisdiction over the corporation itself.
 
 Weller v. Cromwell Oil Co.,
 
 504 F.2d 927 (6th Cir.1974);
 
 Professional Investors Life Ins. Co. v. Roussel,
 
 445 F.Supp. 687 (D.Kan.1978);
 
 Path Instruments v. Asahi Optical Co.,
 
 312 F.Supp. 805 (S.D.N.Y.1970).
 

 “The relationship of bank officers to their bank is analogous to the relationship of corporate officers to their corporation. Therefore we will consider the question of personal jurisdiction here in the same way we would consider it in a corporate frame of reference. It is established that there must be a showing that the individual officers engaged in some activity that would subject them to the state’s long-arm statute before
 
 in personam
 
 jurisdiction can attach.
 

 “In
 
 Idaho Potato Com’n v. Washington Potato Com’n,
 
 410 F.Supp. 171, 181 (D.Idaho 1975) the court said:
 

 “ ‘(U)nless there is evidence that the act by the corporate officer was other than as an agent for the corporation, then personal jurisdiction over the corporate officer will not lie.
 
 Fashion Two Twenty, Inc. v. Steinberg,
 
 339 F.Supp. 836, 842 (E.D.N.Y.1971).’
 

 
 *975
 
 “In this case there was no allegation that the corporate entity was a sham or facade intended only to protect the individual appellees. Nor was there a showing that the appellees engaged in any business for personal gain or profit or any transaction which was outside the scope of their employment with the bank. Thus the corporation could not be said to have acted as an agent of the individual appellees so as to become their alter egos and to warrant personal jurisdiction over them.
 

 [[Image here]]
 

 “While it is sometimes proper to hold that a foreign corporation or bank whose agents acted in Alabama, and caused ramifications in this state, has sufficient contacts with the state to warrant jurisdiction, it is a totally different matter to hold that individual officers have such ... contacts. In this case the officers had never been present in Alabama, and there was no proof that the appellees were conducting any personal business either through the use of the corporation as an alter ego, or through personal agents in this state. Thus this Court finds that the ... contacts necessary to extend personal jurisdiction are lacking.”
 

 373 So.2d at 641-42.
 

 Since the publication of that decision, however, this Court has distinguished
 
 Tham.es
 
 on several bases so as to avoid applying the fiduciary-shield doctrine. For example, in
 
 Ex parte Sekeres,
 
 646 So.2d 640, 641-42 (Ala.1994), this Court explained:
 

 “After
 
 Thames ...
 
 this Court addressed the question of
 
 in personam
 
 jurisdiction over seven corporate officer/employee defendants in
 
 Brooks v. Inlow,
 
 453 So.2d 349 (Ala.1984). The Court affirmed the circuit court’s holding that it had no jurisdiction over the two defendants who had never been present in Alabama, but reversed the judgment in favor of the five defendants who had come to Alabama on corporate business. The Court in
 
 Brooks
 
 distinguished
 
 Thames
 
 by emphasizing the statement in
 
 Thames
 
 that the bank officers had never been present in Alabama. The Court has similarly found personal jurisdiction over directors or officers of corporations in
 
 Keelean v. Central Bank of the South,
 
 544 So.2d 153 (Ala.1989);
 
 Duke v. Young,
 
 496 So.2d 37 (Ala.1986);
 
 Alabama Waterproofing Co. v. Hanby,
 
 431 So.2d 141 (Ala.1983); and
 
 View-All, Inc. v. United Parcel Service,
 
 435 So.2d 1198 (Ala.1983).”
 

 646 So.2d at 641-42.
 

 Moreover, in
 
 Sudduth v. Howard,
 
 646 So.2d 664, 668-69 (Ala.1994), the Court explained a distinctly different analytical approach than was articulated in
 
 Thames:
 

 “We note Larry Howard’s contention that, under the ‘fiduciary shield doctrine,’ he lacks sufficient contact with this state for purposes of personal jurisdiction. We find that argument to be without merit. Larry Howard’s status as an employee or agent of CMS is not relevant in this case. This Court held in
 
 Duke v. Young,
 
 496 So.2d 37, 40 (Ala.1986):
 

 “
 
 7A]s demonstrated by the facts and holding in Calder
 
 [v.
 
 Jones,
 
 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) ],
 
 an individual is not shielded from liability simply because his acts were done in furtherance of his employer’s interest.
 
 In fact, the Court stated there that the defendants’ “status as employees does not somehow insulate them from jurisdiction.”
 
 Calder,
 
 supra, 465 U.S. at 790, 104 S.Ct. at 1487.’
 

 “See, also,
 
 Ex parte Sekeres,
 
 646 So.2d 640 (Ala.1994).
 

 
 *976
 
 “Larry Howard specifically cites us to
 
 Thames v. Gunter-Dunn, Inc.,
 
 373 So.2d 640 (Ala.1979), and
 
 Pierce v. Heyman,
 
 480 So.2d 1185 (Ala.1985). However, the Court in
 
 Duke,
 
 supra, at 40, distinguished
 
 Thames
 
 and
 
 Pierce on
 
 their facts, holding that ‘[i]n each instance the tortious act complained of was exactly what
 
 Calder
 
 referred to as “mere untargeted negligence.” ’ See
 
 Lowry v. Owens,
 
 621 So.2d 1262 (Ala.1993). The thrust of the Sudduths’ allegation is that Larry Howard participated in, if he did not mastermind, a scheme to defraud and deceive potential investors in Alabama. This is not an allegation of ‘mere untargeted negligence.’ Rather, this is an allegation of intentional and tortious action expressly aimed at Alabama residents. See,
 
 Low-ry v. Owens,
 
 supra, at 1266;
 
 Calder,
 
 supra, 465 U.S. at 789, 104 S.Ct. at 1487;
 
 Duke,
 
 supra, at 40.”
 

 646 So.2d at 668-69 (emphasis added).
 
 [9]
 

 By their own admissions, all the individual defendants except Roberts had been to Alabama in connection with the acquisition of Bruno’s. More importantly, the allegations against these defendants do not consist of mere untargeted negligence. Instead, the plaintiffs allege that the defendants were complicit in committing fraudulent suppression, fraudulent misrepresentation, and deceit, all of which, as noted, was allegedly committed to the end of acquiring an Alabama corporation with a significant physical presence in Alabama.
 

 “ ‘A corporate agent who personally participates, albeit in his or her capacity
 
 *977
 
 as such agent, in a tort is personally liable for the tort.’
 
 Sieber v. Campbell,
 
 810 So.2d 641, 645 (Ala.2001).
 
 See also Bethel v. Thorn,
 
 757 So.2d 1154, 1158 (Ala.1999), and
 
 Ex parte Charles Bell Pontiac-Buick-Cadillac-GMC,
 
 496 So.2d 774, 775 (Ala.1986). Likewise, corporate agent status does not insulate the agent personally from his or her jurisdictional contacts with a state or from personal jurisdiction in the state.
 
 Calder v. Jones,
 
 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984);
 
 Sieber,
 
 supra;
 
 Sudduth v. Howard,
 
 646 So.2d 664, 668 (Ala.1994); and
 
 Dulce[ v. Young],
 
 496 So.2d [37] at 40[ (Ala.1986) ].
 

 Ex parte McInnis,
 
 820 So.2d at 798-99; see also
 
 Licciaordello v. Lovelady,
 
 544 F.3d 1280, 1285 (11th Cir.2008) (citing
 
 Calder v. Jones,
 
 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), for the proposition that “[i]ntentional torts ... may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum”).
 

 The individual defendants allegedly engaged in tortious activity directed toward the State of Alabama in connection with the leveraged recapitalization and resulting acquisition of Bruno’s. In addition, the plaintiffs allege that the fraud continued after the leveraged recapitalization through the submission of misleading Bruno’s public filings, filings the individual defendants approved as members of the board of directors of Bruno’s. Based on the torts allegedly committed by the individual defendants, we conclude that the fiduciary-shield doctrine does not insulate those defendants from personal jurisdiction in this State.
 

 B. Case no. 1091206: The Circuit Court’s Denial of the Defendants’ Motion to Dismiss the Plaintiffs’Alabama Securities Act Claims
 

 As we noted at the outset of this opinion, Ronald Bruno seeks a writ of mandamus that would require the circuit court to vacate the portion of its April 16, 2010, order denying the defendants’ motion to dismiss the plaintiffs’ claims under the ASA. Bruno makes two arguments in his petition. First, citing § 8-6-19, Ala. Code 1975,
 
 [10]
 
 he contends that the ASA covers only initial public sales of securities by the owner or issuer of such securities. Bruno asserts that the plaintiffs purchased the notes on the secondary market and, accordingly, that the plaintiffs’ claims under the ASA should have been dismissed.
 
 *978
 
 Second, citing § 8-6-12, Ala.Code 1975,
 
 [11]
 
 Bruno contends that the ASA does not apply to these transactions because none of the offers to sell or offers to buy the notes occurred in Alabama.
 

 As we noted above in the standard of review, aside from certain limited exceptions, the denial of a motion to dismiss is not reviewable through a petition for a writ of mandamus because an adequate remedy is available by way of an appeal. In his petition, Bruno contends that “[t]his Court has jurisdiction to hear this mandamus petition because Mr. Bruno seeks review of an order denying his motion to dismiss based on plaintiffs/respondents lack of standing to assert a claim .under the Alabama Securities Act.”
 

 Bruno is correct that “[m]anda-mus review is available where the petitioner challenges the subject-matter jurisdiction of the trial court based on the plaintiffs alleged lack of standing to bring the lawsuit.”
 
 Ex parte HealthSouth Corp.,
 
 974 So.2d 288, 292 (Ala.2007). Lack of standing was not, however, the basis of the defendants’ motion below concerning the plaintiffs’ ASA claims. The circuit court denied the defendants’ Rule 12(b)(6), Ala. R. Civ. P., motion for failure to state a claim upon which relief could be granted with regard to the plaintiffs’ ASA claim.
 

 In keeping with the arguments made below, Bruno’s arguments in his petition consist of contentions that the plaintiffs do not have a cognizable claim under the ASA because they purchased the notes on the secondary market and because neither the offers to sell nor the offers to buy the notes occurred in Alabama. In other words, the arguments contend that the plaintiffs failed to state a claim for which relief could be granted under the ASA.
 

 “[0]ur courts too often have fallen into the trap of treating as an issue of ‘standing’ that which is merely a failure to state a cognizable cause of action or legal theory, or a failure to satisfy the injury element of a cause of action. As the authors of
 
 Federal Practice and Procedure
 
 explain:
 

 “ ‘The question whether the law recognizes the cause of action stated by a plaintiff is frequently transformed into inappropriate standing terms. The [United States] Supreme Court has stated succinctly that the cause-of-action question is not a question of standing.’
 

 “13A Charles Alan Wright, Arthur K. Miller, and Edward H. Cooper,
 
 Federal Practice & Procedure
 
 § 3531 (2008) (noting, however, that the United States Supreme Court, itself, has on occasion ‘succumbed to the temptation to mingle these questions’). The authors go on to explain:
 

 “ ‘Standing goes to the existence of sufficient adversariness to satisfy both
 
 *979
 
 Article III case-or-controversy requirements and prudential concerns. In determining standing, the nature of the injury asserted is relevant to determine the existence of the required personal stake and concrete adverseness .... The focus of the cause-of-action inquiry must not be confused with standing — it does not go to the quality or extent of the plaintiffs injury, but to the nature of the right asserted.’
 

 “13A
 
 Federal Practice & Procedure
 
 § 3531.6.... Cf. 13B
 
 Federal Practice & Procedure
 
 § 3531.10 (discussing citizen and taxpayer standing and explaining that ‘a plaintiff cannot rest on a showing that a statute is invalid, but must show “some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally” ’).”
 

 Wyeth, Inc. v. Blue Cross & Blue Shield of Alabama,
 
 42 So.3d 1216, 1219-20 (Ala.2010) (emphasis omitted).
 

 The arguments made by Ronald Bruno in his mandamus petition concern an asserted failure by the plaintiffs to allege a claim upon which relief is available under Alabama law. That is, they are arguments that go to the nature of the claims asserted by the plaintiffs, not the nature of any injury sustained by the plaintiffs as a result of the defendants’ conduct. They are arguments that are consistent with a Rule 12(b)(6) motion to dismiss, which is exactly how the defendants framed them before the circuit court. In an effort to gain a review of the circuit court’s ruling on this issue through a mandamus petition, Bruno has incorrectly attempted to recast the defendants’ arguments as raising the issue of the plaintiffs’ standing.
 

 Any alleged error in the circuit court’s decision to deny the defendants’ motion to dismiss for failure to state a claim as to the plaintiffs’ ASA claim can be adequately remedied by appeal. Therefore, Bruno’s mandamus petition is due to be denied.
 

 1091191 — PETITION DENIED.
 

 1091206 — PETITION DENIED.
 

 MALONE, C.J., and WOODALL, STUART, BOLIN, PARKER, SHAW, MAIN, and WISE, JJ., concur.
 

 [1]
 

 . In their mandamus petition in case no. 1091191, the defendants describe KKR Associates and Crimson Associates as “inactive Delaware limited partnership[sl.” Petition, p. 8 n. 4.
 

 [2]
 

 . By way of example, KKR directly or indirectly held significant ownership interests in Safeway, Inc., and in The Stop & Shop Supermarket Company.
 

 [3]
 

 .The plaintiffs did not become aware of the Project Crimson Report until October 1999. Bruno’s had filed for bankruptcy in Delaware federal district court on February 2, 1998. The Project Crimson Report was made available to the plaintiffs through their participation or the participation of their representatives in creditors’ committees formed pursuant to bankruptcy court filings.
 

 [4]
 

 . The prospectus states that following the leveraged recapitalization Bruno’s would be managed by the directors of a corporation called Crimson, which the prospectus states is “an Alabama corporation” that is “a wholly owned subsidiary of Crimson Associates." The directors of Crimson were Raether, Greene, and Brous.
 

 [5]
 

 . Tobin stated that he served on the board from 1995 to 1997.
 

 [6]
 

 . The viability of the plaintiffs’ action against the individual defendants premised in part on the alleged acts and omissions relating to the sale of the notes is not before us.
 

 [7]
 

 . We note that Bruno’s itself is not a defendant in this action but that it was not amenable to suit in this regard because of its status as a debtor in its own bankruptcy proceeding.
 

 [8]
 

 . According to submissions, there are defendants residing or located in Alabama, California, Connecticut, Delaware, and New York. Witnesses, such as representatives of Deloitte, Arthur Andersen, BT Securities, and Chemical Securities, Inc., reside in Illinois and New York. The plaintiffs reside or are located in various states throughout the country.
 

 [9]
 

 . The defendants complain that the trial court “elected not to follow
 
 Thames "
 
 because "[i]t believed, incorrectly, that
 
 names
 
 was effectively superceded by
 
 Calder v. Jones,
 
 465 U.S. 783, 790 (1984).” The trial court reached its conclusion, however, with good reason. The United States Supreme Court itself summarized the holding in
 
 Calder
 
 as follows in a case released the same day:
 

 "[W]e ... reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity. But jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jurisdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary.
 
 Consol. Textile Co. v. Gregory,
 
 289 U.S. 85, 88 (1933);
 
 Peterson v. Chicago, R.I. & P. Railway Co.,
 
 205 U.S. 364, 391 (1907). Each defendant’s contacts with the forum State must be assessed individually. See
 
 Rush v. Savchuk,
 
 444 U.S. 320, 332 (1980) (‘The requirements of
 
 International Shoe ...
 
 must be met as to each defendant over whom a state court exercises jurisdiction.’).”
 

 Keeton v. Hustler Magazine, Inc.,
 
 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). In other words, an evaluation of personal jurisdiction over a defendant should be made independent of his status as a corporate employee. As one federal district court succinctly explained:
 

 "The idea that jurisdiction over individual officers and employees of a corporation may not be predicated on the court's jurisdiction over the corporation survives after
 
 Calder v. Jones.
 
 However, the Supreme Court held that due process does not require that individuals be shielded from suit based solely on their status as employees.
 
 Id.
 
 Rather, a court can assert jurisdiction over officers and employees if jurisdiction is supported by the long-arm statute of the forum state.
 
 See id.
 
 If the state's long-arm statute allows jurisdiction to the extent allowed by the Constitution, then employing the fiduciary shield to insulate employees is inconsistent with the wide reach of the statute.
 
 See, e.g., Davis v. Metro Productions, Inc.,
 
 885 F.2d 515, 522 (9th Cir.1989).
 
 See also
 
 Lynn C. Tyler,
 
 Personal Jurisdiction: Is It Time to Stick a Fork in the Fiduciary Shield Doctrine?,
 
 40-APR Res Gestae 9, 14 (1997); Robert A. Koenig,
 
 Personal Jurisdiction and the Corporate Employee: Minimum Contacts Meet the Fiduciary Shield,
 
 38 Stan. L.Rev. 813, 827 (1986).”
 

 Brink v. First Credit Res., 57
 
 F.Supp.2d 848, 859 (D.Ariz.1999).
 

 [10]
 

 . In pertinent part, § 8-6-19, Ala.Code 1975, provides:
 

 “(a) Any person who:
 

 "(1) Sells or offers to sell a security in violation of any provision of this article or of any rule or order imposed under this article or of any condition imposed under this article, or
 

 "(2) Sells or offers to sell a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission,
 

 "is liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys’ fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition.”
 

 [11]
 

 . In pertinent part, § 8-6-12, Ala.Code 1975, provides:
 

 "(a) The provisions of this article shall apply to persons who sell or offer to sell when
 

 "(1) an offer to sell is made in this state, or
 

 “(2) an offer to buy is made and accepted in this state.
 

 "(b) The provisions of this article shall apply to persons who buy or offer to buy when
 

 "(1) an offer to buy is made in this state, or
 

 "(2) an offer to sell is made and accepted in this state.
 

 "(c) An offer to sell or to buy is made in this state, whether or not either party is then present in this state, when the offer
 

 "(1) originates from this state, or
 

 "(2) is directed by the offeror to this state and received at the place to which it is directed (or at any post office in this state in the case of a mailed offer).”