MURDOCK, Justice.
Getloaded Corporation, TransCore,[1] and Roper Industries, Inc. (hereinafter collectively referred to as “the Getloaded defendants”), and American Timber & Steel Company, Inc. (“ATSC”), petition this *350 Court for writs of mandamus directing the Montgomery Circuit Court to dismiss them as defendants based on a lack of personal jurisdiction in actions filed by Bishop Ivey, Carolyn Kelley, Joan Foye Wynn, Sonie Taylor, Annette Fenn, Kendra Bouier, and Jenny Simmons (hereinafter collectively referred to as “the plaintiffs”). We have consolidated the petitions for the purpose of writing one opinion. We deny ATSC’s petition and grant the Getloaded defendants’ petition.

I. Facts and Procedural History

ATSC is an Ohio corporation with its principal place of business in Ohio. ATSC’s primary business is the purchase and sale of lumber and timber products for the commercial-construction industry.
The Getloaded defendants are all related entities. Roper Industries is a Delaware corporation with its principal place of business in Florida. Roper Industries is the parent corporation of TransCore and either the parent corporation or grandparent corporation of Getloaded Corporation. See note 3, infra. TransCore is a Delaware corporation with its principal place of business in Pennsylvania. TransCore is either the parent corporation or a sister corporation of Getloaded Corporation. See note 3, infra. Getloaded Corporation is a Virginia corporation with its principal place of business in that state.
In late September or early October 2008, ATSC sold some lumber owned by it and located at a facility operated by Texas Forest Products, Inc.,[2] in Gilmer, Texas, to Barfield Fence, a business located in Apopka, Florida. Eric Duffey, the shipping-traffic manager for ATSC, attempted through his usual contacts to find a carrier for the lumber at a price of $2,000. When those avenues of contact failed, Duffey listed the proposed shipment and requested shipping quotes on Getloaded.com, a Web site to which ATSC is a subscriber, or “member,” and which the plaintiffs alleged is “operated” by the Getloaded defendants.[3] In part, the Web site includes a *351 “load board” on which truckers can advertise that their trucks are available and shippers and brokers can advertise that they have loads that need to be transported. The Web site also has a message board that allows truckers, shippers, and brokers to communicate with one another.
After seeing ATSC’s post, a representative of Lewis Trucking Company (“Lewis”), which is located in Georgia and which is also a member of Getloaded.com, contacted Duffey. Thereafter, ATSC and Lewis agreed that Lewis would transport the lumber from Texas to Florida for ATSC’s asking price of $2,000. Duffey used “the Federal Motor Carrier SafeStat” Web site to research Lewis’s United States Department of Transportation motor carrier, or “MC,” number before he agreed to Lewis’s transporting ATSC’s materials. The Web site apparently is operated by the Department of Transportation, and anyone can use the site to conduct research on a carrier, provided the researcher has the carrier’s MC number, its legal name, and its domicile. According to Duffey, research based on MC numbers commonly is used to confirm whether a carrier’s “authority is in effect, ... insurance is still up to date, and that they don’t have ... a lot of violations or ... problems.” Duffey agreed that carriers on “Safestat” are assigned “SEA safety numbers” between 1 and 100 and that as a carrier’s SEA safety number “approached] 100, you’re about as unsafe as you can get.” He admitted that he was aware that Lewis had a SEA safety number of 98.22 when he decided ATSC would utilize Lewis’s services. According to Duf-fey, he made the decision to use Lewis despite its poor SEA safety number because Lewis had not had a safety violation for two years. There is no evidence indicating that Duffey made the decision to use Lewis in reliance upon any representation made by any of the Getloaded defendants on the Web site.
We note that the safety record of a carrier could be determined by using “links” found on Getloaded.com to connect to the Web sites of one or more other companies who advertise on the Getloaded site.[4] Also, Bonnie Davis, a customer-support supervisor for the Web site, see note 3 supra, testified that she and fellow employees would provide, upon request, information to Getloaded.com members from the “SafeStat” Web site. We note that the plaintiffs alleged in their complaint that despite its poor safety record, Lewis was allowed to join Getloaded.com as a member and “list itself as a safe, qualified common carrier available to shippers and/or brokers.” The plaintiffs further alleged that the Getloaded defendants “made no effort to inquire into the accident history, vehicle history, and/or driver’s history despite the fact other similar Web sites, including those operated by the [Getloaded defendants[5]], routinely undertake such an investigation before allowing ... Lewis ... to be listed as a safe hauler of freight on Getloaded.com.”
Andrew Carter, an employee of Lewis, drove the 18-wheel tractor-trailer truck that carried the lumber shipment for ATSC; the truck was owned by Lewis. Carter apparently picked up the lumber *352 from Texas Forest Products on October 2, 2008. The lumber was scheduled for delivery to Barfield Fence on October 6, 2008. On October 3, 2008, Carter was driving the loaded truck west on Alabama Highway 82 in Montgomery County, Alabama. At the same time, an Alabama Department of Corrections (“ADOC”) van was traveling east on Highway 82. The ADOC van was carrying six applicants for employment with ADOC from the Bullock County Correctional Facility to the Draper Correctional Facility in Elmore County. The van was being driven by an ADOC corrections officer.
The plaintiffs allege that approximately four miles west of the Bullock County line, Carter attempted to pass another 18-wheel tractor-trailer truck being driven by Johnny Nunez for Swift Transportation Company (“Swift”). Although the trucks were in a no-passing zone, Nunez allegedly signaled Carter that it was clear to pass. While attempting to execute the pass, the truck driven by Carter hit the ADOC van in a frontal-impact collision. The van subsequently was engulfed in fire, and all six passengers and the driver of the ADOC van were killed in the accident.
The plaintiffs are representatives of the estates of the occupants of the ADOC van who died as a result of the October 3, 2008, accident. The plaintiffs filed separate actions in the Montgomery Circuit Court between October 31, 2008, and November 3, 2008. The plaintiffs’ respective complaints asserted claims against Lewis, Carter, Nunez, and Swift. In five of the actions, the plaintiffs also asserted claims against ATSC for allegedly improperly loading the lumber into the Lewis truck.[6] The lumber allegedly shifted when Carter attempted to avoid the accident, which, in turn, contributed to his losing control of the truck. ATSC filed an answer to the complaints in which, among other things, it pleaded lack of personal jurisdiction. In April 2009, the claims against ATSC were voluntarily dismissed without prejudice. The plaintiffs then reached a settlement with Swift and Nunez.
In July 2010, all the plaintiffs filed a consolidated motion to amend their respective complaints. The circuit court granted the motion. On August 30, 2010, the plaintiffs filed a consolidated amended complaint that “reallege[d] all paragraphs of their Complaints” and added the Getload-ed defendants and ATSC as defendants. In part, the amended complaint alleged that ATSC “owed a duty to members of the traveling public to use reasonable care to investigate and evaluate the competence and safety record of any carrier hired to transport freight” and that it had negligently or wantonly breached that duty. It also alleged that ATSC had negligently entrusted a lumber load to Lewis “knowing that [Lewis] and its drivers were unfit and dangerous” for performing such a task.
As to the Getloaded defendants, the amended complaint alleged that they operated the Getloaded.com Web site; that they “owed or assumed a duty to members of the traveling public to use reasonable care to investigate and evaluate the competence and safety record of any carrier allowed to be listed for hire on its [sic] Web site”; and that they “negligently or wantonly breached that duty.”
In September 2010, ATSC and the Get-loaded defendants filed motions to dismiss the amended complaints for lack of personal jurisdiction, along with evidentiary materials in support of their motions. The plaintiffs filed a motion for discovery *353 as to the jurisdiction issue. Though the materials before us do not reflect the ruling of the circuit court on that motion, the parties thereafter conducted discovery concerning the circuit court’s personal jurisdiction over ATSC and the Getloaded defendants. The plaintiffs then filed an opposition to the motions to dismiss, with supporting documentation.
On March 11, 2011, the circuit court held a hearing on the motions to dismiss for lack of personal jurisdiction. On March 31, 2011, the circuit court entered an order denying the motions and stating that “[ATSC] and the [Getloaded defendants] had sufficient minimum contacts with the State of Alabama to justify the exercise of in personam jurisdiction.” The Getloaded defendants filed a “Motion to Reconsider and Renewed Motion to Dismiss,” including additional supporting evidence. The circuit court denied the motion. Thereafter, ATSC and the Getloaded defendants filed the present petitions seeking writs of mandamus directing the circuit court to dismiss the claims against them for lack of personal jurisdiction.

II. Standard of Review

The writ of mandamus is a drastic and extraordinary writ, to be
“issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.”
Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala.1993). Also, it is well settled that
“a petition for a writ of mandamus is the proper device by which to challenge the denial of a motion to dismiss for lack of in personam jurisdiction. See Ex parte McInnis, 820 So.2d 795 (Ala.2001); Ex parte Paul Maclean Land Servs., Inc., 613 So.2d 1284, 1286 (Ala.1993). ‘“An appellate court considers de novo a trial court’s judgment on a party’s motion to dismiss for lack of personal jurisdiction.”’ Ex parte Lagrone, 839 So.2d 620, 623 (Ala.2002) (quoting Elliott v. Van Kleef 830 So.2d 726, 729 (Ala.2002)). Moreover, ‘[t]he plaintiff bears the burden of proving the court’s personal jurisdiction over the defendant.’ Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir.2002).”[7]
Ex parte Dill, Dill, Carr, Stonbraker & Hutchings, P.C., 866 So.2d 519, 525 (Ala.2003).
“ ‘ “ ‘In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiffs complaint not controverted by the defendant’s affidavits, Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253 (11th Cir.1996), and Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829 (11th Cir.1990), and “where the plaintiffs complaint and the defendant’s affidavits conflict, the ... court must construe all reasonable inferences in favor of the plaintiff.” Robinson, 74 F.3d at 255 (quoting Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir.1990)).’ ”
“ ‘Wenger Tree Serv. v. Royal Truck & Equip., Inc., 853 So.2d 888, 894 (Ala.2002) (quoting Ex parte McInnis, 820 So.2d 795, 798 (Ala.2001)). How *354 ever, if the defendant makes a prima facie evidentiary showing that the Court has no personal jurisdiction, “the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and he may not merely reiterate the factual allegations in the complaint.” Mercantile Capital, LP v. Federal Transtel, Inc., 193 F.Supp.2d 1243, 1247 (N.D.Ala.2002) (citing Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir.2000)). See also Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474-75 (D.Del.1995) (“When a defendant files a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion.”) (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir.1984)).’
“Ex parte Covington Pike Dodge, Inc., 904 So.2d 226, 229-30 (Ala.2004).”
Ex parte Bufkin, 936 So.2d 1042, 1045 (Ala.2006).

III. Analysis

Both ATSC and the Getloaded defendants contend that the circuit court erred in concluding that they possessed the minimum contacts necessary for the circuit court to exercise personal jurisdiction over them. They argue that the circuit court’s decision as to personal jurisdiction could not properly be based on what is known as “general jurisdiction” or what is known as “specific jurisdiction.”[8] We agree with ATSC and the Getloaded defendants as to the issue of general jurisdiction.[9] For the sake of brevity, we limit *355 our discussion to an analysis of the issue of so-called “specific jurisdiction.”
“The extent of an Alabama court’s personal jurisdiction over a person or corporation is governed by Rule 4.2, Ala. R. Civ. P., Alabama’s ‘long-arm rule,’ bounded by the limits of due process under the federal and state constitutions. Sieber v. Campbell, 810 So.2d 641 (Ala.2001). Rule 4.2(b), as amended in 2004, states:
“‘(b) Basis for Out-of-State Service. An appropriate basis exists for service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States....’
“In accordance with the plain language of Rule 4.2, both before and after the 2004 amendment, Alabama’s long-arm rule consistently has been interpreted by this Court to extend the jurisdiction of Alabama courts to the permissible limits of due process. Duke v. Young, 496 So.2d 37 (Ala.1986); DeSotacho, Inc. v. Valnit Indus., Inc., 350 So.2d 447 (Ala.1977). As this Court reiterated in Ex parte McInnis, 820 So.2d 795, 802 (Ala.2001) (quoting Sudduth v. Howard, 646 So.2d 664, 667 (Ala.1994)), and even more recently in Hiller Investments Inc. v. Insultech Group, Inc., 957 So.2d 1111, 1115 (Ala.2006): ‘Rule 4.2, Ala. R. Civ. P., extends the personal jurisdiction of the Alabama courts to the limit of due process under the federal and state constitutions.’ ...
“This Court discussed the extent of the personal jurisdiction of Alabama courts in Elliott v. Van Kleef, 830 So.2d 726, 730 (Ala.2002):
“‘This Court has interpreted the due process guaranteed under the Alabama Constitution to be coextensive with the due process guaranteed under the United States Constitution. See Alabama Waterproofing Co. v. Hanby, 431 So.2d 141, 145 (Ala.1983), and DeSotacho, Inc. v. Valnit Indus., Inc., 350 So.2d 447, 449 (Ala.1977)....
“‘The Due Process Clause of the Fourteenth Amendment permits a forum state to subject a nonresident defendant to its courts only when that defendant has sufficient “minimum contacts” with the forum state. International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The critical question with regard to the nonresident defendant’s contacts is whether the contacts are such that the nonresident defendant “ ‘should reasonably anticipate being haled into court’ ” in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), quoting WorldWide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).’ ”
Ex parte DBI, Inc., 23 So.3d 635, 643-44 (Ala.2009) (emphasis omitted).
In DBI, this Court closely reexamined United States Supreme Court precedent as to in personam jurisdiction. In so doing, we noted that the United States Supreme Court had stated:
“‘[T]he constitutional touchstone remains whether the defendant purposefully established “minimum contacts” *356 in the forum State. Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a “sufficient benchmark” for exercising personal jurisdiction. Instead, “the foreseeability that is critical to due process analysis ... is that the defendant’s conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.” In defining when it is that a potential defendant should “reasonably anticipate” out-of-state litigation, the Court frequently has drawn from the reasoning of Hanson v. Denckla, 357 U.S. 235, 253 (1958):
“ ‘ “The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant’s activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.”
“ ‘This “purposeful availment” requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of “random,” “fortuitous,” or “attenuated” contacts, or of the “unilateral activity of another party or a third person.” Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a “substantial connection” with the forum State. Thus where the defendant “deliberately” has engaged in significant activities within a State, or has created “continuing obligations” between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by “the benefits and protections” of the forum’s laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.
“ ‘Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant’s affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor’s efforts are “purposefully directed” toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.’ ”
23 So.3d at 652-53 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473-76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (emphasis omitted)). The DBI Court continued:
“Significantly, the Supreme Court in Burger King quoted from World-Wide Volkswagen [Corp. v. Woodson, 444 U.S. 286 (1980) ], as follows:
“‘Thus “[t]he forum State does not exceed its powers under the Due Process Clause if it asseHs personal jurisdiction over a corporation that de *357 livers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State” and those products subsequently injure forum consumers.’
“471 U.S. at 473, 105 S.Ct. 2174 (quoting World-Wide Volkswagen, 444 U.S. at 297-98,100 S.Ct. 559).”
23 So.3d at 653 (emphasis added). Further, the DBI Court noted:
“Once the Supreme Court determined in Burger King that minimum contacts had been established, the Court discussed other factors that could be considered in establishing jurisdiction.
“ ‘Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with “fair play and substantial justice.” Thus courts in “appropriate case[s]” may evaluate “the burden on the defendant,” “the forum State’s interest in adjudicating the dispute,” “the plaintiffs interest in obtaining convenient and effective relief,” “the interstate judicial system’s interest in obtaining the most efficient resolution of controversies,” and the “shared interest of the several States in furthering fundamental substantive social policies.” These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.’ ”
23 So.3d at 653 (quoting Burger King, 471 U.S. at 476-77, 105 S.Ct. 2174 (footnotes and citations omitted)).
The DBI Court then applied the foregoing principles to the Korean seat-belt-manufacturer defendant in that case, stating:
“DBI first argues that it has not purposefully directed any activities toward Alabama and that it cannot be subject to jurisdiction in Alabama simply because it placed a product into the stream of commerce. DBI maintains that it does not know how many of its seat belts are placed in automobiles that are destined for Alabama and that it is unable to determine how much revenue it derives from seat belts in vehicles delivered to Alabama.... DBI contends, Leytham must prove that DBI purposefully availed itself of the privilege of doing business in Alabama, and, DBI says, there is no evidence before this Court that establishes that DBI purposefully directed any activities toward Alabama. DBI maintains there is no evidence in this record showing that it knew its products were being marketed in Alabama. The evidence, DBI says, shows only that it knew that its products were incorporated into automobiles being sold by Kia Motors in the North American market. Therefore, DBI concludes, it had no reason to anticipate being sued in Alabama.
“Leytham points out that DBI contracted with a New Jersey company to test its seat belts to obtain a label stating that the seat belts complied with the FMVSS [United States Federal Motor Vehicle Safety Standards], which rendered the seat belts marketable in the United States. Furthermore, Leytham says, DBI entered into a claims-indemnification contract with Kia Motors; it maintains insurance coverage against risks or losses occurring in the United States; and it retains defense counsel here. Leytham argues that because DBI designed its seat belts to comply with the FMVSS and because it knew that Kia Motors would incorporate its seat belts into automobiles that would be *358 sold, nationally in the United States, DBI should have known that some of those automobiles would be sold in Alabama. Should any of those seat belts prove defective, Leytham says, DBI should have anticipated that it could be sued in Alabama.
“After considering all the facts and circumstances presented in this case, we conclude that DBI purposefully availed itself of the privilege of doing business in the Alabama market so that exercising jurisdiction over it would not offend the requirements of due process.
“Although DBI has never had a physical presence in Alabama, being physically present in a state is not required in order for a state court to have personal jurisdiction over a defendant. Burger King, 471 U.S. at 476, 105 S.Ct. 2174. DBI knew that its seat belts were incorporated into automobiles sold by Kia Motors in the United States. It is not subject to reasonable dispute that it is generally known that a product such as a mass-produced automobile is marketed on a broad spectrum and is not a boutique product fit for only a narrow class of consumers. Likewise, an automobile manufacturer is involved in the sales of its products on a national as opposed to a regional basis. Perhaps the supplier of a part to a snow-plow manufacturer could reasonably say it did not anticipate that its product would be sold in Alabama, but, clearly, moderately priced, fuel-efficient automobiles, such as those manufactured by Kia Motors, are destined for sale in all 50 states in this country. Kia Motors has nine dealerships in Alabama. DBI, by choosing to enter into a contractual relationship with Kia Motors pursuant to which DBI would turn a profit by supplying an essential component part vital to the safety of passengers for such automobiles under the circumstances here described, cannot reasonably assert ignorance of these realities of the marketplace.
[[Image here]]
“Under the stream-of-commerce test, as articulated in World-Wide Volkswagen and Burger King, we conclude that the trial court correctly held that an Alabama court can exercise personal jurisdiction over DBI. As previously noted, the United States Supreme Court stated in both World-Wide Volkswagen and Burger King that ‘ “[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State” and those products subsequently injure forum consumers.’ 471 U.S. at 473, 444 U.S. at 297-98.
“The automobile containing the seat belt that Leytham alleges malfunctioned and contributed to Stabler’s death did not find its way to Alabama randomly and fortuitously. To the contrary, a dealer acting for a manufacturer with which DBI had significant ties sold the vehicle in Alabama to an Alabama resident who was driving on an Alabama highway when she died as a result of the accident that is the subject of this lawsuit. In this respect, the circumstances here are totally different from those in Worldr-Wide Volkswagen, where an automobile purchased in New York from a New York dealer by New York residents happened to be involved in an accident in Oklahoma.
“As the Supreme Court stated in World-Wide Volkswagen, the foreseeability crucial to a due-process analysis is not the ‘mere likelihood’ that a product will find its way into the forum state but that a defendant’s conduct and its *359 connection with the forum state ‘are such that he should reasonably anticipate being haled into court there.’ 444 U.S. at 297, 100 S.Ct. 559. In selling seat belts compliant with the FMVSS to Kia Motors, DBI should have foreseen that a certain percentage of the automobiles manufactured by Kia Motors would be distributed to the Kia dealerships in Alabama and sold in Alabama. Therefore, we hold that it would have been reasonable for DBI to anticipate being haled into court in Alabama. Indeed, DBI purchased insurance to protect itself in such event.”
23 So.3d at 654-56 (emphasis added).
As noted above, the plaintiffs’ claims as to ATSC include the allegation that ATSC “owed a duty to members of the traveling public to use reasonable care to investigate and evaluate the competence and safety record of any carrier” hired by ATSC to transport freight. The plaintiffs assert that ATSC failed to fulfill that duty and, among other things, was negligent in hiring Lewis to transport its products. By incorporating the claims asserted in the original complaints, the plaintiffs also alleged that ATSC negligently loaded the Lewis truck, which, they say, contributed to Carter’s loss of control of the truck. We do not address the viability of these claims but, instead, assume for purposes of this proceeding that the complaint alleges cognizable duties and violations of duties by ATSC that led to the accident in question. The question we address then is whether it would violate due-process rights for ATSC to be required to address the viability of, and other issues concerning the merits of, those claims in an Alabama court.[10] In light of the above-emphasized principles recognized in DBI, we conclude that it would not.
As noted, the plaintiffs’ action as to ATSC is based on allegations that ATSC acted tortiously in hiring Lewis to haul its lumber from Texas to Florida and in loading the Lewis truck. It cannot reasonably be contended that ATSC did not expect that that shipment would traverse Alabama. Similarly, it was foreseeable that, if ATSC failed to properly load its products onto the truck it had hired or to properly vet the trucking company it had hired to haul the load, a risk would be posed to members of the traveling public along the way.
As we recognized in DBI:
*360 “ ‘The protection against inconvenient litigation is typically described in terms of “reasonableness” or “fairness.” We have said that the defendant’s contacts with the forum State must be such that maintenance of the suit “does not offend ‘traditional notions of fair play and substantial justice.’ ” The relationship between the defendant and the forum must be such that it is “reasonable ... to require the corporation to defend the particular suit which is brought there.” Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State’s interest in adjudicating the dispute; the plaintiffs interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiffs power to choose the forum; the interstate judicial system’s interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.’ ”
23 So.3d at 650 (quoting World Wide Volkswagen, 444 U.S. at 292). Consistent with the above-quoted general principles, including the “other relevant factors” noted, we cannot conclude that the claims alleged against ATSC are such that it would “offend ‘traditional notions of fair play and substantial justice’ ” for ATSC to be required to appear in this forum to address the merits of the claims against it.
We reach a different conclusion as to the Getloaded defendants, however. As noted above, the Getloaded defendants are foreign corporations with their respective principal places of business in states other than Alabama. They own no property in Alabama and maintain no offices, agents, or employees here; they do no business on a regular basis in this State. For purposes of the plaintiffs’ effort to demonstrate specific jurisdiction in relation to the claims alleged against the Getloaded defendants in this case, the Getloaded defendants have no meaningful contacts with Alabama unless contacts sufficient for that purpose may be attributed to them as a result of the operation of the Web site or some shortcoming in the way in which the Web site was operated.
Assuming the viability of the plaintiffs’ legal theory — that the Getloaded defendants had a duty to the traveling public to investigate and to publish on the Web site information regarding the competence of carriers who made their availability for hire known on that site — any connection between the Getloaded defendants and the State of Alabama resulting from the fact that they did not fulfill that duty as to Lewis, and from the fact as alleged by the plaintiffs that the risk posed by Lewis and its drivers eventually manifested itself in Alabama, would not be an appropriate basis for Alabama courts to exercise jurisdiction over the Getloaded defendants. This is so because, unlike ATSC, the Getloaded defendants did not arrange for the loading of the Lewis truck or for Lewis to “carry” a product from Texas to Florida. Indeed, the Getloaded defendants had no awareness whatsoever of the carriage arrangement that eventually brought Carter onto Alabama’s highways. Thus, unlike the defendant in DBI, the Getloaded defendants cannot be said to have had an “expectation” that anything they did could create a risk for the traveling public within the State of Alabama. Compare DBI, 23 So.3d at 655 (holding that in personam jurisdiction may be exercised over a nonresident defendant that “ ‘ “delivers its products into the stream of *361 commerce with the expectation that they will be purchased by consumers in the forum State” ’ ” (quoting Burger King, 471 U.S. at 473, quoting in turn World-Wide Volkswagen, 444 U.S. at 298)). Carter’s presence in Alabama, where he posed a risk to the traveling public, was a result of decisions made by parties other than the Getloaded defendants. As this Court has acknowledged, the necessary contact with a forum state cannot be the result merely of “ ‘ “unilateral activity of another party or a third person.” ’ ” Ex parte DBI, 23 So.3d at 653 (quoting Burger King, 471 U.S. at 475, quoting in turn Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).
Based on the foregoing, we cannot say that the Getloaded defendants’ alleged contacts with Alabama and with the events that gave rise to the plaintiffs’ claims were such that it would comport with “traditional notions of fair play and substantial justice” for them to be required to defend against the plaintiffs’ claims in this State.

IV. Conclusion

Considering ATSC’s alleged acts and omissions in the context of the cause of action alleged against it, and applying the principles reiterated in DBI (including such factors as the burden on the defendant, the forum State’s interest in adjudicating the dispute, the plaintiffs interest in obtaining convenient and effective relief, the interstate judicial system’s interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies), we conclude that ATSC’s due-process rights are not violated by requiring it to address in this forum the merits of the claims against it. We cannot, however, reach the same conclusion as to the Getloaded defendants. Accordingly, we deny ASTC’s petition and grant the Getloaded defendants’ petition. The circuit court is instructed to dismiss the Getloaded defendants from this action based on a lack of in personam jurisdiction.
1100884 — PETITION DENIED.
1100885 — PETITION GRANTED; WRIT ISSUED.
MALONE, C.J., and WOODALL, BOLIN, and WISE, JJ., concur.
MURDOCK, J., concurs specially.

. TransCore is a corporation; however, neither the briefs nor the materials before us provide any indication as to its complete name.

. Texas Forest Products, Inc., treats and stores lumber owned by ATSC.

. Getloaded.com was formerly owned by Get-loaded.com, LLC. Getloaded Acquisition Corporation purchased Getloaded.com, LLC, and thereafter dissolved the limited liability company. According to deposition testimony from Bonnie Davis (who testified that she was a customer-support supervisor with Getload-ed Acquisition Corporation), in July 2008 TransCore, which is owned by Roper Industries, purchased Getloaded Acquisition Corporation. Davis also stated, however, that Get-loaded.com was itself owned by TransCore.
In their amended complaint, the plaintiffs named TransCore, Roper Industries, Getload-ed.com, LLC, and Getloaded Acquisition Corporation as defendants. Nevertheless, Get-loaded Corporation appeared in the action in conjunction with the other Getloaded defendants (i.e., TransCore and Roper Industries). In the Getloaded defendants’ motion to dismiss for lack of personal jurisdiction, see discussion, infra, they asserted that Getloaded Acquisition Corporation had changed its name to Getloaded Corporation and that Get-loaded.com, LLC, was no longer "in existence and did not own any interest in Getload-ed.com at the time the events at issue in this lawsuit occurred.” They further asserted that Getloaded Corporation "operates” Getload-ed.com, that TransCore is an "affiliate” corporation of Getloaded Corporation, and that Roper Industries is Getloaded Corporation's parent corporation.
We note that the plaintiffs did not contest the foregoing assertions, and no contention is made that Getloaded Corporation is not a proper party in this case or as to the present petition filed by the Getloaded defendants. We also note that an affidavit from Paul Soni, vice president and controller for Roper Industries, which the Getloaded defendants submitted in conjunction with their motion to reconsider the denial of their motion to dismiss, avers that both Getloaded Corporation and TransCore are wholly owned subsidiaries of Roper Industries, implies that Getloaded.com is owned by Getloaded Corporation, and states that TransCore operates a Web site that competes with Getloaded.com.

. For example, Getloaded.com included a link to a service that advertised on the Web site and was called CarrierWatch. CarrierWatch purportedly allowed a shipper or broker to confirm, among other things, a carrier’s safety rating, possession of appropriate insurance certificates, and authority to serve as a carrier.

. TransCore apparently operates a Web site that competes with Getloaded.com, but it is unclear if that is the site to which the complaint refers.

. Specifically, the plaintiffs' allegations of improper loading were asserted against ATSC doing business as Midwest Wood Products, Inc., which apparently has an office in Texas.

. Of course, an appellate court must give deferential consideration to any findings of fact made by a trial court based on evidence received ore tenus in connection with a determination as to the nature and extent of a foreign defendant’s contacts with the forum state.

. This Court stated in Elliott v. Van Kleef, 830 So.2d 726, 730-31 (Ala.2002):
" ‘Two types of contacts can form a basis for personal jurisdiction: general contacts and specific contacts. General contacts, which give rise to general personal jurisdiction, consist of the defendant’s contacts with the forum state that are unrelated to the cause of action and that are both “continuous and systematic.” Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 9, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); [citations omitted]. Specific contacts, which give rise to specific jurisdiction, consist of the defendant's contacts with the forum state that are related to the cause of action. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Although the related contacts need not be continuous and systematic, they must rise to such a level as to cause the defendant to anticipate being haled into court in the forum state. Id.'
"Ex parte Phase III Constr., Inc., 723 So.2d 1263, 1266 (Ala.1998) (Lyons, J., concurring in the result). Furthermore, this Court has held that, for specific in personam jurisdiction, there must exist 'a clear, firm nexus between the acts of the defendant and the consequences complained of.’ Duke v. Young, 496 So.2d 37, 39 (Ala.1986). See also Ex parte Kamilewicz, 700 So.2d 340, 345 n. 2 (Ala.1997).”

. In relation to the State of Alabama, both ATSC and the Getloaded defendants clearly lack "continuous and systematic general business contacts” of the nature the United States Supreme Court recently reaffirmed are necessary for the exercise of so-called "general jurisdiction" over a foreign corporation. Goodyear Dunlop Tires Operations, S.A. v. Brown, — U.S. —, —, 131 S.Ct. 2846, 2853-54 (2011) (further explaining that "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual’s domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home”). We note that neither ATSC nor the Getloaded defendants have an office in Alabama or employees or property in Alabama, nor have they registered to do business in Alabama. Although ATSC and Getloaded Corporation have in the past engaged in some business transactions involving Alabama residents or materials located here, those contacts do not approach the type *355 of relationship with a forum necessary for the exercise of general jurisdiction.

. Compare Board of Trs., Sheet Metal Workers' Nat’l Pension Fund v. Elite Erectors, Inc., 212 F.3d 1031, 1035 (7th Cir.2000) (explaining that "[wjhether the defendant is liable under ERISA is the subject to be litigated following service; it is not a condition precedent to personal jurisdiction”); C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd., 626 F.Supp.2d 837, 842-43 (N.D.Ill.2009) (stating that the defendant’s "motion to dismiss for lack of personal jurisdiction must be considered first” because "[i]f the court finds it lacks personal jurisdiction over [the defendant], it will become unnecessary to consider his motion to dismiss for failure to state a claim upon which relief can be granted”). Cf. Wyeth, Inc. v. Blue Cross & Blue Shield of Alabama, 42 So.3d 1216, 1220 (Ala.2010) (“[A]lthough questions may exist regarding the viability under Alabama law of the particular legal theory asserted by BCBSAL ..., if we assume that theory to be viable for purposes of our standing inquiry, it is easy to see that BCBSAL has ‘the required personal stake' to assert that theory.”); Voyager Ins. Cos. v. Whitson, 867 So.2d 1065, 1079 (Ala.2003) (Johnstone, J., concurring in part and dissenting in part) (" ‘[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23[, Fed.R.Civ.P.,] are met. "The determination whether there is a proper class does not depend on the existence of a cause of action. A suit may be a proper class action, conforming to Rule 23, and still be dismissed for failure to state a cause of action.” ’ ” (quoting Miller v. Mackey Int’l, Inc., 452 F.2d 424, 427 (5th Cir.1971))).